331 So.2d 151 (1976)
Willard FEE and Donald Fee d/b/a Fee Brothers Logging Contractors, Plaintiffs-Appellees,
v.
VANCOUVER PLYWOOD CO., INC., Defendant-Appellant.
No. 5339.
Court of Appeal of Louisiana, Third Circuit.
March 30, 1976.
Rehearing Denied May 19, 1976.
Writ Refused July 2, 1976.
*152 Smitherman, Smitherman, Lunn, Hussey & Chastain, by Merritt B. Chastain, Jr., Shreveport, for defendant-appellant.
John P. Navarre, Oakdale, for plaintiffs-appellees.
Before HOOD, CULPEPPER, DOMENGEAUX, GUIDRY and PETERS, JJ.
GUIDRY, Judge.
This is a suit for damages for breach of a logging contract. Plaintiffs and Defendant entered into a written contract of date January 3, 1973 by which Fee Brothers Logging Contractors (hereafter sometimes referred to as Contractor) agreed to cut and haul timber for Defendant (hereafter sometimes referred to as Vancouver). During the term of the contract, i. e., January 3, 1973 through March 31, 1974, Contractors were to have the exclusive right to cut and haul timber and timber products designated by Vancouver for cutting, the timber tract or tracts covered by the agreement to be identified by Vancouver for Contractors by a separate letter agreement marked Exhibit "A" which was to be attached to the contract. According to the agreement, the parties contemplated that, from time to time, such letter agreement might be amended by a subsequent letter agreement or agreements, which would also be attached to and become part of the initial contract.
On December 5, 1973 the parties executed a letter of agreement marked Exhibit "A" wherein Vancouver designated a 270 acre tract of land in Grant Parish described as "Sec. 2 T 6 N 2 W, Sec. 35 T 7 N R 2 W, Sec. 34 T 7 N R 2 W" for cutting by Contractor under the terms of the initial agreement. Plaintiffs started logging the tract on December 6th. On December 7th, John Read, Timber Department Manager for Vancouver, terminated the contract with plaintiffs.
There is a conflict in the evidence as to what transpired between the time Exhibit "A" was signed and Contractors work was terminated. The evidence presented by Vancouver reflects that on the morning of December 5th John Read began negotiations with Contractor for the logging of the 270 acre tract. During these negotiations Contractor visited the tract to be logged in company with Talbot Watson, logging supervisor for Vancouver. On this visit to the tract Contractor was specifically advised that Vancouver would block up the tract into smaller areas and would direct the sequence in which these blocks would be cut to the end that one small area would be logged and cleaned up before starting on another. Pursuant to this plan and during this visit Watson advised contractor that the job should be commenced in an area east of a road which cut across the tract. Thereafter, on the same day, Watson and plaintiffs returned to Vancouver's office and executed Exhibit "A". At about noon on the 6th of December Watson returned to the 270 acre tract and found plaintiffs cutting timber on the west side of the road in an area where Watson had on the previous day told them that they were not to cut. In addition Watson found that on the east side of the road (where plaintiffs were supposed to be working) there were several lodged trees, many not yet cut, and many logs strewn about on the ground. In short, the area to be initially logged had not been completely *153 cut nor cleaned. Watson told plaintiffs they were working in the wrong area and that they should move back across the road and completely log and clean up the tract first designated before moving to another. Plaintiffs agreed to do so. On Watson's return to the office he reported what he had found to his superior, John Read. On the following day John Read went to the tract and again found plaintiffs logging in the area west of the road where they had been told not to cut. Read also found that the area east of the road had not been completely logged or cleaned up. Read then tried to tell plaintiffs that they should immediately return to the east side of the road and log the tract pursuant to the instructions given to them by Watson. At that point, plaintiffs became abusive of Read advising that they would do the job in the manner they chose. One of the plaintiffs, Willard Fee, then struck Read whereupon Read terminated the contract and told plaintiffs to get their equipment off of the tract.
Plaintiffs' version is that nothing was ever said to them concerning how the tract was to be logged. Plaintiffs denied that they were ever told by Talbot Watson that they were cutting the wrong area rather they testified that on Watson's December 6th visit he told them that they were doing a good job. Concerning Read's visit on the 7th of December, plaintiffs' version is that Read arrived at the tract, jumped out of his car and immediately, and without any explanation, told plaintiffs they were fired.
The trial court accepted defendant's version of the facts but found that plaintiffs' refusal to log the tract as instructed by Vancouver did not violate any of the provisions of the contract. The trial judge found that the contract contained no explicit provision which would permit Vancouver to subdivide the large tract into smaller tracts and direct the sequence in cutting, and accordingly held that Vancouver was without right to terminate the contract because of plaintiffs unwillingness to abide by Vancouver's instructions. The trial court rendered judgment in favor of plaintiffs and against defendant in the amount of $25,000.00
Defendant appealed and contends that by virtue of the contract Vancouver had the right to direct the manner in which the tract was to be logged as it sought to do; plaintiffs breached the contract by refusing to abide by its instructions; and, under such circumstances defendant had the right to terminate the contract.
For the reasons hereinafter set forth we determine that the trial judge erred when he concluded that Vancouver had not the right under the contract to direct contractor's operations as it sought to do. Accordingly, we reverse the judgment of the trial court.
The trial court was clearly correct in accepting defendant's version of the facts. There is no doubt but that prior to the commencement of logging operations Vancouver, through its employees, subdivided the 270 acre tract into smaller tracts and advised contractor as to the sequence in which these tracts should be cut and that each such tract should be completely logged and cleaned up before moving to another. It is equally clear that Vancouver terminated the contract only after contractor absolutely refused to log the tract pursuant to Vancouver's directions.
There was clear, uncontradicted testimony at the trial that it is a long standing custom in the sawlog industry for the timber owner to subdivide a timber tract into smaller areas and to direct the logging contractor concerning the sequence in which these areas are to be logged. It is also customary practice in the logging industry that the timber owner supervise the contractor to the end that in cutting the blocked tracts in sequence that each tract will be completely logged and cleaned up before the contractor begins to cut on another tract. Mr. James Henry Smart, an expert in forest management, who was called as a witness by plaintiff, testified at *154 length as to the customs and standards which maintain in the logging industry. He emphasized that the owner of a large timber tract (a tract of 270 acres being considered large) must maintain "control of the job" by designating from time to time the specific areas which can be cut. He stated that under such circumstances a logger who cuts somewhere other than where he has been specifically instructed to cut violates accepted standards prevailing in the logging industry. He also stated that it is a violation of long standing custom for a logger to leave an area and move to another before the first area has been completely logged and cleaned up. There is nothing in the record to contradict the opinion of Mr. Smart in this regard. On the contrary, the parties stipulated that three other forestry experts would testify to the same effect if they were called, i. e., Clyde Knox, an employee of Hunt Lumber Company, Mr. James C. Way, a forester with Powell Lumber Company and Arlie H. Wilkerson, a forester with Boise-Southern Company.
The above being considered, although it may be said that the contract contains no explicit provisions giving to Vancouver the right to subdivide the 270 acre tract into smaller tracts with the corresponding right to direct the sequence and clean up of each subdivided tract, we conclude that Vancouver, as a result of long standing custom in the logging industry, enjoys such rights as an incident to the contract.
LSA-CC Article 1903 provides as follows:
"The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect."
LSA-CC Article 1964 provides as follows:
"Equity, usage and law supply such incidents only as the parties may reasonably be supposed to have been silent upon from a knowledge that they would be supplied from one of these sources."
LSA-CC Article 1966 provides in pertinent part as follows:
"By the word usage mentioned in the preceding articles, is meant that which is generally practiced in affairs of the same nature with that which forms the subject of the contract."
It is clear that the parties intended that custom and practice in the logging industry should supply incidents to the contract on which the contract was silent for in paragraph 7 of the contract the parties specifically agreed as follows:
"Contractor shall conduct its logging operatings in a workmanlike manner and as a prudent operator so as to avoid and minimize danger to the timber not cut under this contract. Contractor shall perform this contract in a diligent, practical businesslike manner as is customary in sawlog production." (Emphasis mine)
As previously indicated, although the contract may be said to contain no specific provision or provisions giving to Vancouver the right to direct the logging operation as it sought to do in the instant case, the contract does contain two separate provisions which can reasonably be interpreted as granting such rights. Paragraphs 4 and 7 of the subject agreement provide as follows:
"Contractor agrees to cut, remove, haul and deliver logs or other timber products as designated by Vancouver from time to time. Logs or trees shall be scaled by Doyle Log Rule, or weight converted to log scale in accordance with Doyle Log Rule, as modified by Vancouver and utilized uniformly in the locality. Contractor understands that Vancouver requires a steady flow of timber and timber products in order to operate efficiently and contractor agrees, weather permitting, to *155 deliver to Vancouver at its designated delivery point volumes of logs or timber products prescribed by Vancouver on either daily, weekly or monthly basis. Contractor agrees to deliver the timber cut currently as same is cut so as to prevent deterioration, blue stain or bug damage between the time of cutting and delivery." (Par. 4)
"Contractor shall conduct its logging operations in a workmanlike manner and as a prudent operator so as to avoid and minimize damage to the timber not cut under this Contract. Contractor shall perform this Contract in a diligent, practical, businesslike manner as is customary in sawlog production. Contractor shall comply with all applicable rules and regulations of any governmental authority having jurisdiction in the premises. Contractor shall not be responsible for the removal or other disposition of slash, except that Contractor shall leave the property lines, drainage ditches and canals free and clear of debris such as cull logs, tops and jump-butts. Should contractor fail promptly to remove and clear such debris after notice from Vancouver, then Contractor shall be liable for any and all expenses incurred in the removal of such debris." (Par. 7)
Pursuant to the quoted provisions of paragraph 4 Contractors agreed to cut, remove, haul and deliver logs or other timber products AS DESIGNATED BY VANCOUVER FROM TIME TO TIME. This provision can reasonably be interpreted to mean that Vancouver reserved the right to control cutting on the tract identified in Exhibit "A" by subdividing said tract and directing the sequence of cutting on the subdivided tracts. Likewise, the provisions of paragraph 7 can reasonably be construed to grant this right to Vancouver with the corresponding right to require contractor to completely log and clean up one tract before moving to another, especially since contractor under such provision agrees to perform in a diligent, practical, businesslike and workmanlike manner AS IS CUSTOMARY IN SAW LOG PRODUCTION.
In this latter connection plaintiff contends that at best such provisions are ambiguous and therefore since Vancouver prepared the subject contract any ambiguous provision must be construed against Vancouver and in a light most favorable to plaintiffs. R.C.C. Articles 1957 and 1958. We recognize that this is one rule of construction. However, in matters of construction the primary objective is to determine the intent of the parties. In the instant case we are dealing with a standard form logging contract wherein, the plaintiff, a logging contractor, was obligated to perform under the contract in a manner "as is customary in sawlog production." Regardless that the above referenced provisions of the contract may be ambiguous, these provisions are not per se to be construed against Vancouver, but instead the ambiguity, if any, should more properly be resolved from the common intent of the parties and according to the usage of the place where the contract is made. Civil Code Articles 1950 and 1953. It is well settled in our jurisprudence that custom or usage should be taken into consideration in interpreting an ambiguous contract. Terrell v. Alexandria Auto Company, 12 La. App. 625, 125 So. 757; Moore v. Johnston, 8 La.Ann. 488; LSA-CC Arts. 1903, 1964 and 1966.
For the above reasons we hold that by their absolute refusal to log the subject tract in the manner directed by Vancouver plaintiffs violated their obligations under the contract and accordingly defendant had the right to terminate the contract.
Accordingly the judgment of the District Court is reversed and it is now ordered, adjudged and decreed that plaintiffs' suit be dismissed, all costs on the trial and appellate level to be taxed to plaintiffs.
*156 REVERSED AND RENDERED.
DOMENGEAUX, J., concurs in the decree. The parties intended that customs of the trade prevail as shown in Paragraph 7 of the contract. The custom referred to in the opinion was amply proven.
CULPEPPER and PETERS, JJ., dissent and assign written reasons.
CULPEPPER and PETERS, Judges (dissenting).
While we do not take issue with the majority's conclusions of fact, we cannot agree that the contract between Vancouver and the Fee Brothers gave Vancouver the right to control cutting of the timber tract by subdividing it into smaller areas.
It should be pointed out initially that paragraph 14 of the contract specifically excluded from the agreement anything that was not found in the written contract. Paragraph 14 reads as follows:
14. Entire Contract. This contract, when duly executed by the parties, together with Exhibit "A," as same may be amended and superceded from time to time, shall constitute the entire agreement between the parties. Any amendment or modification of said contract must be in writing and signed by both parties.
Because of paragraph 14, custom cannot be a part of the agreement between the parties unless it is specifically incorporated by reference in the terms of the written contract. We cannot find any such incorporation.
The only reference to custom is found in one sentence of paragraph 7:
"Contractor shall perform this contract in a diligent, practical, businesslike manner as is customary in sawlog production."
This provision is ambiguous and should therefore be construed against Vancouver, who drafted the contract. LSA-C.C. 1957.
If Vancouver wished to reserve to itself the right to control the sequence of cutting, it could have specifically so provided in the contract. Vancouver failed to do so and should not be allowed to use the oblique wording of paragraph 7 to achieve that result.
Furthermore, even if it were assumed that the contract incorporated by reference the customs of the industry, Vancouver failed to establish at trial that the Fee Brothers had violated the customs of the industry by refusing to allow Vancouver to control the sequence of cutting. The majority relies heavily on the testimony of Mr. James Henry Smart, an expert in forest management. Mr. Smart testified that it was customary in the sawlog industry for a timber owner to subdivide a large timber tract into smaller areas for cutting. However, there was no evidence whatsoever to indicate the substance of the contracts which were customarily entered into between timber owners and logging contractors. It is possible that timber owners customarily reserve by contract the specific right to control the manner in which a contractor cut a large timber tract. If this were the custom, it would certainly have no effect on the Fee Brothers, who entered into a contract which made no mention of any right on the part of Vancouver to control the sequence of cutting. The issue in the present case is whether defendant had the right by contract to control plaintiff's logging operations. The evidence concerning the custom of the industry had no reference to the contract which had been agreed upon between the Fee Brothers and Vancouver and this evidence is therefore irrelevant. The majority cites Terrell v. Alexandria Auto Co. (2nd Cir., 1930), 12 La.App. 625, 125 So. 757, for the proposition that custom or usage should be considered in interpreting an ambiguous contract. In Terrell, the court addressed itself to this issue by saying:
"In interpreting a contract not specific in its wording, it is necessary to take into consideration the custom of the *157 place and the usual and customary manner of fulfilling like contracts in arriving at what was the reasonable expectation of the parties to the contract at the time it was made." (125 So. 757 at 759) (Emphasis ours.)
The evidence in the instant case did not show what was the customary manner of fulfilling a "like contract." Thus, even if it were assumed that the customs of the sawlog industry were a part of the contract, the evidence fails to establish that the Fee Brothers violated those customs.
The only reference to "control" in the contract is found in paragraph 3, the pertinent part of which reads as follows:
"It is understood that contractor is an independent contractor and that Vancouver will exercise no control over any employee of contractor nor over any equipment owned or used by contractor."
Although the underlying purpose of this clause was apparently to exonerate Vancouver from any liability towards the Fee Brothers or their employees for workmen's compensation, the means of achieving this purpose was to disavow control over the contractor. While this clause is not addressed to the specific question at issue here, i. e. did Vancouver have the right to control the sequence of cutting, it does have a tendency to negate any control by Vancouver over the Fee Brothers.
The majority also finds that paragraph 4 gives Vancouver the right to verbally designate which sections of the tract were to be cut first. We cannot agree with such a construction. We would find that paragraph 4 is also ambiguous and should be construed against Vancouver. While the interpretation urged by Vancouver may be a reasonable one, it is just as reasonable to construe that paragraph in other ways; for example, it may mean only that defendant has the right to designate the type and quantity of timber products to be cut and hauled by plaintiffs. Paragraph 4 in its entirety is concerned with the quantity of timber products to be cut and delivered by the contractor. There is no indication in paragraph 4 that contractor must obtain those timber products from areas to be selected by Vancouver.
Viewing this case as a whole, the majority has resorted to custom to add to this contract a provision which could be very onerous for the logger. If the timber owner has the right to instruct the logger where and when to cut, he could cause the logger's work to be much more burdensome and expensive. It is difficult to believe that the ordinary logging contractor would agree to an express provision granting such a right to the timber owner, without giving this serious consideration as to how it might affect the logger's costs. This is not a matter which the logging contractor would take lightly if it were written into an agreement, and it is certainly not a matter which should be impliedly written into the agreement from custom.
For the reasons assigned, we respectfully dissent. We would affirm the judgment of the lower court.