# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 12, 2013

No. 11-30038

Lyle W. Cayce
Clerk

TOTAL E&P USA, INC.,

Plaintiff - Appellee

STATOIL GULF OF MEXICO, L.L.C.,

Intervenor Plaintiff - Appellee

v.

KERR-MCGEE OIL AND GAS CORP; LYNN BELCHER; C. DAN BUMP; CATHY ZEORNES GUY; GARY A. HUMMEL; ALLEN D. KEEL; KEVIN A. SMALL; WAYNE G. ZEORNES,

Defendants - Appellants

LYNN S. BELCHER; C. DAN BUMP; CATHY ZEORNES GUY; GARY A. HUMMEL; ALLAN D. KEEL; KEVIN A. SMALL; WAYNE G. ZEORNES,

Plaintiffs - Appellants

v.

STATOIL GULF OF MEXICO, L.L.C.,

Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

No. 11-30038

Before GARZA, DENNIS, and HIGGINSON, Circuit Judges.

DENNIS, Circuit Judge:

This case involves a contractual interpretation dispute over whether overriding royalties are payable out of the initial oil and gas production from a tract of land on the outer continental shelf adjacent to Louisiana. In 1998, pursuant to the Outer Continental Shelf Lands Act ("OCSLA"),[1] the United States issued a mineral lease of the tract to oil companies for mineral exploration. In 1999 and 2001, overriding royalty interests ("ORRI") were carved out of the lessees' working interest in all production and assigned to seven individuals referred to herein as the "Belcher Group" (ORRIs totalling 0.2625% assigned in 1999) and to Kerr-McGee Oil and Gas Corporation ("Kerr-McGee") (ORRI of 3.7373% assigned in 2001).

When production under the lease was obtained in 2009, three oil companies owned the lessees' working interests: Chevron USA, Inc. ("Chevron") (58% share), Total E&P USA, Inc. ("Total") (17% share), and Statoil Gulf of Mexico, L.L.C. ("Statoil") (25% share). Chevron immediately began paying overriding royalties out of its share of the production to the Belcher Group and Kerr-McGee. Total and Statoil, however, took the position that they were not obliged to immediately begin paying overriding royalties out of their shares of production. They claimed that no overriding royalties were due because the ORRI assignment contracts contained "calculate and pay" clauses stating that: "The overriding royalty interest assigned herein shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease."[2] Total and Statoil asserted that the "calculate and pay" clauses were intended to suspend their obligation to pay

---

[1] 43 U.S.C. § 1331 et seq.

[2] Although the two "calculate and pay" clauses vary slightly in wording, it is undisputed that they are identical in substance.

overriding royalties out of production whenever payments of the United States' 12½% landowner royalty under the lease were to be suspended pursuant to the Outer Continental Shelf Deep Water Royalty Relief Act ("DWRRA").[3]

It is undisputed that, upon the commencement of production under the lease in 2009, the payment of the government's 12½% landowner royalties was determined to be suspended until 87.5 million barrels of oil equivalent had been produced, pursuant to the DWRRA. Therefore, Total and Statoil argue, no overriding royalties are due so long as the payment of the U.S. landowner royalties are suspended. The Belcher Group and Kerr-McGee disagreed, contending that the "calculate and pay" clauses were not intended to suspend overriding royalties under any circumstances but were meant to ensure that overriding royalties would be calculated using the same methods as required by the lease for measuring and computing the government's 12½% landowner royalties. In other words, they argued that the "calculate and pay" clauses were intended to specify the manner of calculation and payment of overriding royalties, not to make the accrual of overriding royalties dependent upon the payment of landowner royalties to the United States. This litigation ensued. Because Chevron agreed with the ORRI owners' interpretation of the "calculate and pay" clauses and continued to pay overriding royalties to them, Chevron has not been sued or made a party to this case.[4]

The district court granted a motion for summary judgment by Total and Statoil, declaring that the "calculate and pay" clauses in the 1999 and 2001 ORRI assignments clearly and explicitly require that the payment of overriding

---

[3] Pub. L. No. 104-58 (1995) (codified at 43 U.S.C. § 1337(a), and with further uncodified sections present in notes to 43 U.S.C. § 1337).

[4] The district court correctly determined that it had jurisdiction over this action pursuant to OCSLA's broad jurisdictional grant, 43 U.S.C. § 1349(b)(1). *See, e.g., Tidelands Royalty "B" Corp. v. Gulf Oil Corp.*, 804 F.2d 1344, 1347 n.1 (5th Cir. 1986).

royalties shall be suspended during the suspension of the U.S. 12½% landowner's royalty under the DWRRA. The district court expressly refused to engage in further interpretation of the assignment contracts in search of the parties' intent or to consider any evidence on that issue.

The Belcher Group and Kerr-McGee appealed. The issue on appeal comes down to whether the language in the "calculate and pay" clauses providing that the overriding royalties "shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the lease" clearly, explicitly, and unambiguously was intended to suspend the payment of overriding royalties if, upon production, the DWRRA were to result in a threshold suspension of the payment of landowner royalties to the United States.

We conclude, under the applicable Louisiana law, that the "calculate and pay" clauses in the ORRI assignment contracts do not clearly and explicitly express the intent that overriding royalty payments shall be suspended whenever the U.S. landowner royalties are suspended under the DWRRA; and that the "calculate and pay" clauses must be interpreted further in search of the common intent of the parties to the assignment contracts. Assuming without deciding that the "calculate and pay" clauses may reasonably be interpreted as Total and Statoil contend, the clauses are at least ambiguous because a reasonable inference also may be drawn that the "calculate and pay" clauses merely refer to the lease terms and conditions for the method of calculating overriding royalties and that they do not intend for the lessees' obligation to pay overriding royalties out of production to be suspended altogether under any circumstances. Because of this ambiguity and permissible inference, there is a genuine dispute as to a material issue of fact, viz., the assignment contract parties' intentions regarding the "calculate and pay" clauses. Therefore, because, in reviewing the summary judgment de novo, we must resolve all

4

No. 11-30038

ambiguities, permissible inferences, and material issues of fact in favor of the non-moving parties, the Belcher Group and Kerr-McGee, we conclude that Total and Statoil are not entitled to a judgment as a matter of law. For these reasons, we reverse the district court's summary judgment and remand the case to it for further proceedings.

## BACKGROUND

**A.    Relevant Federal Statutes, Regulations, and Interpretations**

To understand the legal context within which the ORRI assignment contracts must be interpreted, it is helpful to have a general understanding of the governing federal statutes and regulations, as they have been interpreted by this court.[5]

"[OCSLA] authorizes the Secretary of the [Interior] to grant and manage leases for recovery of oil, gas, and other minerals from submerged lands located on the Outer Continental Shelf." *Mesa Operating Ltd. P'ship v. U.S. Dep't of Interior*, 931 F.2d 318, 319 (5th Cir. 1991). "OCSLA thus vests the federal government with a proprietary interest in the [outer continental shelf] and establishes a regulatory scheme governing leasing and operations there." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994). "OCSLA provides that the [Department of the Interior ('DOI')] obtains royalties from lessees based on the 'amount or value of the production saved, removed, or sold.'" *Mesa Operating Ltd.*, 931 F.2d at 319-20 (quoting 43 U.S.C. § 1337(a)(1)).

"OCSLA also vests in the Secretary the sole authority and responsibility to 'prescribe such rules and regulations as may be necessary to carry out such

---

[5] Section 1 of the lease provides: "This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. § 1331 et seq., as amended (92 Stat. 629), (hereinafter called the 'Act'). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of the this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of all natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations."

[leasing] provisions [of OCSLA].'" *Id.* at 319 (alterations in original) (quoting 43 U.S.C. § 1334(a)). Pursuant to this authority, the DOI has several times issued regulations governing how royalties on production from OCSLA leases are to be computed and how lessees are to record and report production information relevant to those calculations. The regulations in effect when the lease here was issued in June 1998 were promulgated by the DOI agency then known as the Mineral and Mining Service ("MMS"). Those regulations provided, inter alia, that "[a]ll oil (except oil unavoidably lost or used on, or for the benefit of, the lease, including that oil used off-lease for the benefit of the lease when such off-lease use is permitted by the [agency], as appropriate) produced from a Federal . . . lease . . . is subject to royalty," 30 C.F.R. § 202.100(b)(1) (1997); and that "[w]hen paid in value, the royalty due shall be the value, for royalty purposes, [under the regulations] multiplied by the royalty rate in the lease," *id.* § 202.100(a)(1).[6] These provisions apply to the United States' landowner's royalty owed by OCSLA mineral lessees and not to overriding royalties owed by lessees to third party ORRI owners.

The DWRRA, enacted in 1995 to stimulate deepwater mineral exploration,[7] authorized the DOI to suspend the collection of oil and gas royalties

---

[6] The regulations also set "[t]he value of oil production from [OCSLA] leases" by reference to "[t]he lessee's contemporaneous posted prices or oil sales contract prices used in arms-length transactions for purchases or sales of significant quantities of like-quality oil in the same field," or pursuant to one of several alternative formulas. 30 C.F.R. § 206.102(c) (1997). "Value [was] based on the highest price a prudent lessee can receive through legally enforceable claims under its contract." *Id.* § 206.102(j). "[U]nder no circumstances [was] the value of production, for royalty purposes, [to] be less than the gross proceeds accruing to the lessee for lease production, less applicable allowances." *Id.* § 206.102(h). Lessees were required to "make available, upon request to the authorized [government officials], arm's-length sales and volume data for like-quality production sold, purchased, or otherwise obtained by the lessee from the field or area or from nearby fields or areas." *Id.* § 206.102(d).

[7] *See, e.g.*, 43 U.S.C. § 1337(a)(3)(B) (providing that the DOI may suspend government royalties "in order to . . . promote development or increased production on producing or non-producing leases[] or . . . encourage production of marginal resources" on such leases); 63 Fed. Reg. 2605-1 (Jan. 16, 1998) ("[The DWRRA's] purpose is to promote development or increased

by the United States as landowner from certain new and preexisting federal, deepwater leases until specified threshold volumes of production had been attained, at which time landowner royalty payments would recommence. *See Santa Fe Snyder Corp. v. Norton*, 385 F.3d 884, 888-89 (5th Cir. 2004). Additionally, for new deepwater leases issued between 1996 and 2000 for specific areas and depths in the Gulf of Mexico, DWRRA § 304 provided qualified lessees with relief from royalty payments to the United States until a specific volume of oil or gas had been produced. *Id.* at 889. However, in issuing federal leases during this period, MMS by regulation prescribed that "one royalty suspension volume [would be] shared by all leases producing from a single field" and "imposed a requirement for policy reasons that no royalty suspension would be available to leases in fields when any well in that field produced oil or gas prior to the enactment of the [DWRRA]." *Id.* at 891. The agency also "impose[d] price thresholds requiring the payment of royalties on volumes less than the volume thresholds set by [the DWRRA]." *Kerr-McGee Oil & Gas Corp. v. U.S. Dep't of Interior*, 554 F.3d 1082, 1083 (5th Cir. 2009). When oil and gas prices moved above those price thresholds, the DOI sought to collect royalties on these leases, despite the fact that the congressionally set volume thresholds had not yet been met. *Id.*

In *Kerr-McGee*, an oil company challenged the DOI's order to pay such royalties, and this court concluded that the agency did not have the authority to impose price thresholds requiring the payment of royalties to the government on volumes less than the volume thresholds set by Congress in the DWRRA. *Id.* at 1086-87. The court looked to its 2004 decision in *Santa Fe Snyder Corp.*, which had held that DWRRA § 304 extends royalty relief to each new lease at

production, or to encourage production of marginal resources, for [Gulf of Mexico] leases lying west of 87 degrees, 30 minutes West longitude.").

statutorily-specified locations and water-depths and that the DOI did not have the authority to limit this royalty relief to new leases that first resulted in production from a field. *See Kerr-McGee*, 554 F.3d at 1085-86. Consequently, until this court's 2004 and 2009 decisions interpreting and clarifying the meaning and application of § 304, it could not be predicted with certainty whether production from a particular new oil and gas well would definitely qualify for a suspension of the U.S. landowner's royalty under the DWRRA.

## B.    The OCSLA Lease and the ORRI  Assignment Agreements

MMS issued Lease OCS-G 20082, to Mariner Energy,  Inc., and Westport Oil and Gas Company, Inc. ("Westport") pursuant to 43 U.S.C. § 1337 and effective June 1, 1998. The form lease describes the leased property as "[a]ll of Block 640, Green Canyon, OCS Official Protraction Diagram, NG 15-3." The property is located approximately 190 miles south of New Orleans. The lease was issued with a lessor's royalty rate of 12½ per cent. A footnote to this royalty rate provision states: "This lease may be eligible for royalty suspension pursuant to PL 104-58. If eligible, Sections 5 and 6 [providing for payment of royalty to Lessor] of this lease instrument will be suspended by 30 C.F.R. Part 26, published in the Federal Register on January 16, 1998 (63 FR 2626)."[8]

On November 3, 1999, Westport executed an assignment conveying to six of the seven of the Belcher Group appellees ORRIs "payable out of *all* oil, gas, and casing head gas and associated substances produced, saved, and marketed from the lease" (emphasis added) in the following percentages: Wayne G. Zeornes 0.125%; Gary Al Hummel 0.125%; Kevin A. Small 0.125%; C. Dan Bump

---

[8] Sections 5 and 6 of the form lease are boilerplate provisions specifying, inter alia, that "[t]he Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty" of 12½%; that "[t]he Lessee shall pay [this] fixed royalty . . . in amount or value of production saved, removed, or sold from the leased area"; that "[t]he Lessor shall determine whether production royalty shall be paid in amount or value"; and that "[t]he value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production."

0.025%; Allan D. Keel 0.025%; Lynn S. Belcher 0.0625%. These individuals were Westport geoscientists and landmen whom the company chose to reward with extra compensation by carving overrides for them out of its working interest. The six Wesport geoscientists and landmen held on to their overrides, except for Zeornes, who split his override with his ex-wife, Cathy Zeornes Guy. Kerr-McGee received a 3.7373% ORRI in 2001 pursuant to an assignment containing a "calculate and pay" provision substantively identical to that in the Belcher Group assignment, which stated that "[t]he overriding royalties described herein shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease."

## C.     Production Under the Lease and District Court Litigation

Production under the lease began in May 2009. Chevron then began paying the ORRI owners their designated overriding royalty shares from its working interest production and has continued to do so ever since. Total began approving and issuing payments to the override owners but stopped after paying the Belcher Group about $54,000 in royalties. Statoil made no payments to the overriding royalty owners. These refusals to pay overriding royalties were premised on Statoil and Total adopting the position that they were not obligated to make any payments to appellants until the lease produced 87.5 million barrels of oil equivalent, on the theory that the "calculate and pay" provisions subjected appellants' ORRIs to suspension along with the U.S. landowner's royalty under the DWRRA.

On October 2, 2009, Total filed suit against the ORRI owners, the Belcher Group and Kerr-McGee, in the U.S. District for the Eastern District of Louisiana seeking a declaratory judgment embracing Total's interpretation of the ORRI assignments. In January 2010, the Belcher Group filed suit against Statoil seeking declaratory judgment that the lessees were obliged to pay overriding royalties to the ORRI owners from first and all production. The district court

consolidated the cases. Through interventions, third-party claims, and counterclaims, Total and Statoil became aligned against the Belcher Group and Kerr-McGee.

Total and Statoil moved for summary judgment, contending that the ORRI assignment contracts' "calculate and pay" clauses clearly and explicitly demonstrate the contracting parties' intent that overriding royalty payments to ORRI owners shall be suspended whenever the government's 12½% landowner royalty becomes suspended under the DWRRA. Total and Statoil did not submit any affidavits or other evidence in support of their motion for summary judgment. Instead, they relied upon what they contend to be the clear and explicit words of the "calculate and pay" clauses of the assignment contracts.

In opposition to appellees' motion for summary judgment, appellants submitted affidavits by the individual members of the Belcher Group and by the Westport official who approved both of the original ORRI assignments, attesting that the parties to those assignments intended by the "calculate and pay" clauses to refer to the lease for the purpose of measuring and computing overriding royalties and not for the purpose of suspending overriding royalties during the suspension of the U.S. landowner's royalty under the DWRRA. Also, the appellants submitted an expert witness' survey of representatives of other oil companies operating in the Gulf of Mexico. This survey purportedly identified at least eighty other overriding royalty instruments containing "calculate and pay" provisions like that at issue here and determined that no other company party to such an instrument interpreted these provisions to subject overriding royalty interests to "royalty suspension" under the DWRRA. Appellants also submitted other affidavits and sworn statements from individuals familiar with the Gulf of Mexico oil industry supporting their reading of the "calculate and pay" provision. Appellants did not cross-move for summary judgment.

No. 11-30038

On December 14, 2010, the district court granted summary judgment for the appellees, concluding that the "calculate and pay" provisions clearly and explicitly express the common intent of the assignment contract parties that the payment of overriding royalties shall be suspended whenever the payment of the government's 12½% landowner's royalty is suspended under the DWRRA.[9] In sum, the district court reasoned as follows:

> [I]t is undisputed that the DWRRA applies to the subject Lease, and thus, the federal government's royalty is suspended during production of the first 87.5 million barrels of oil equivalent. . . . [T]he subject "calculate and pay" clauses are not ambiguous because they clearly provide that the overriding royalties "shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's [federal government's] royalty under the Lease." Thus, Total's and Statoil's payments of the overriding royalty interest payments are suspended until production reaches the 87.5 million barrels of oil equivalent.

*Total E&P USA, Inc. v. Kerr-McGee Oil & Gas Corp.*, Nos. 09-CV-6644 & 10-CV-106, 2010 WL 5207591, at *4 (E.D. La. Dec. 14, 2010) (fourth alteration in original).

The district court refused to consider the opposing affidavits served and filed by appellants as extrinsic evidence tending to show the original assignment parties' intent that the "calculate and pay" clauses refer to the terms and conditions of the lease for the purpose of measuring and computing the overriding royalties and not for the purpose of defeating or deferring overriding royalties while the government's 12½% landowner's royalty is suspended under

---

[9] Appellants argue in the alternative that the contract should be reformed on the basis of mutual mistake because none of the original contracting parties to the assignment of overriding royalty interests intended that the clause would have the meaning ascribed to it by the district court. Because we conclude that the ORRI assignment contracts containing the "calculate and pay" provisions do not clearly and explicitly require that payment of overriding royalties from production shall ever be suspended because the government's landowner royalty is suspended, and that further interpretation is required in search of the assignment parties' intent, we reverse and remand the case for further proceedings in that regard, without reaching the appellants' alternative contract reformation argument.

11

No. 11-30038

the DWRRA. The district court concluded that the provision regarding words of art and technical terms set forth in Louisiana Civil Code article 2047[10] did not apply because "there is no one word or group of words in the subject 'Calculate and Pay' provisions that is subject to a technical meaning." *Total*, 2010 WL 520791, at \*4. The district court thus stated that it "need not consider extrinsic evidence to give the words of these provisions their generally prevailing meaning." *Id.* After quoting Civil Code article 2046,[11] the district court further reasoned:

> Here, there are no absurd consequences of tying the overriding royalty owners' payments to those of the federal government as landowner, and treating the overriding royalty owner no better or worse than the federal government. The DWRRA was enacted several years before either assignment here was executed, and the original parties to the assignments were charged with the knowledge of that law before the assignments were executed. If the original parties to the assignments had intended to provide for payment of the overriding royalties on the first 87.5 million barrels when federal royalties on the same production was suspended by the DWRRA, they were obligated to "expressly state their intent in [their] agreement."

*Id.* at \*5 (alteration in original) (citations omitted) (quoting *Kenner Indus., Inc. v. Sewell Plastics, Inc.*, 451 So. 2d 557, 560 (La. 1984)).

The Belcher Group and Kerr-McGee timely appealed.

## DISCUSSION

We review the district court's grant of summary judgment de novo, affirming only if the moving party has demonstrated that there is no genuine issue as to any material fact and that judgment as a matter of law is warranted.

---

[10] Article 2047 provides in part: "Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047.

[11] Article 2046 provides: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046.

No. 11-30038

*McMurray v. ProCollect, Inc.*, 687 F.3d 665, 669 (5th Cir. 2012); *see* Fed. R. Civ. P. 56(c). In determining whether a case presents triable issues of fact, we, like the district court, may not make credibility determinations or weigh the evidence and we must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

"Under the OCSLA, the law to be applied to the [outer continental shelf] is exclusively federal, albeit the law of the adjacent state is adopted as surrogate federal law to the extent that such law is applicable and not inconsistent with federal law." *EP Operating Ltd. P'ship*, 26 F.3d at 566. Here, the parties agree that Louisiana contract law governs the interpretation of the ORRI assignment contracts at issue, "[t]o the extent that [law is] applicable and not inconsistent with [OCSLA] or with other Federal laws and regulations," because Louisiana is the state adjacent to the portion of the outer continental shelf where the oilfield is located. *See* 43 U.S.C. § 1333(a)(2)(A); *see also Gardes Directional Drilling v. U.S. Turnkey Exploration Co.*, 98 F.3d 860, 865 (5th Cir. 1996) (explaining that "OCSLA uses state law to fill gaps in federal law").

"In order to determine state law, federal courts look to final decisions of the highest court of the state. When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Transcont'l Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992) (citing, inter alia, *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456 (1967)).

Under Louisiana law, the essential quality of an overriding oil and gas royalty is that of a real right to receive and collect a fraction or a percentage of the production of minerals, carved out of the mineral lessee's or the servitude owner's working interest in production, free of drilling and production costs. The Louisiana Supreme Court has explained that "[t]he lessor's royalty is

13

distinguished from the mineral royalty and the overriding royalty. The former is the right to participate in the production of mineral from land or a servitude belonging to another, La. Rev. Stat. § 31:80, while the latter is carved out of the lessee's working interest in the lease." *Frey v. Amoco Prod. Co.*, 603 So. 2d 166, 171 n.8 (La. 1992); *see Plaquemines Parish Comm'n Council v. Delta Dev. Co., Inc.*, 486 So. 2d 129, 134 (La. Ct. App. 1986) ("The overriding mineral royalty is a passive, non-cost bearing mineral interest carved out of the lessee's working interest and is dependent upon the continued existence of the mineral lease." (citing, inter alia, *Fontenot v. Sun Oil Co.*, 243 So. 2d 783 (La. 1971)), *rev'd on other grounds*, 502 So. 2d 1034 (La. 1987)); Williams & Meyers, Manual of Oil & Gas Terms (2009) (defining an "overriding royalty" as "[a]n interest in oil and gas produced at the surface, free of the expense of production, and in addition to the usual landowner's royalty reserved to the lessor in an oil and gas lease").

The Louisiana Supreme Court has consistently applied the Louisiana Civil Code articles on the interpretation of contracts, along with other applicable provisions of state law, in deciding cases involving oil and gas lease and royalty questions. *See, e.g.*, *Frey*, 603 So. 2d at 172. The court has summarized the relevant principles as follows:

> The purpose of interpretation is to determine the common intent of the parties. *See* La. Civ. Code art. 2045. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter, *see* La. Civ. Code art. 2047, and words susceptible of different meanings are to be interpreted as having the meaning that best conforms to the object of the contract. *See* La. Civ. Code art. 2048. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. La. Civ. Code art. 2053. When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract

of that kind or necessary for the contract to achieve its purpose. La. Civ. Code art. 2054.

*Frey*, 603 So. 2d at 172.

In Louisiana, "[p]arol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless there is ambiguity in the written expression of the parties' common intent." *Blanchard v. Pan-OK Prod. Co., Inc.*, 755 So. 2d 376, 381 (La. Ct. App. 2000). "A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation." *Id.*; *accord CLK Co., LLC v. CXY Energy, Inc.*, 972 So. 2d 1280, 1287 (La. Ct. App. 2007); *see Dixie Campers, Inc. v. Vesely Co.*, 398 So. 2d 1087, 1089 (La. 1981) ("[W]e conclude that the contract in this case is susceptible to more than one reasonable interpretation rendering it ambiguous and uncertain as to the intention of the parties."). "These rules are applicable even to contracts involving rights in immovable property, such as mineral rights." *Blanchard*, 755 So. 2d at 381.

Accordingly, when a contract provision relating to mineral rights is ambiguous on a pivotal issue, the Louisiana Supreme Court and Courts of Appeal have interpreted the provision as having the meaning that best conforms to the object of the contract, in light of the nature of the contract, equity, and usages, including extrinsic evidence as to custom and practices in the oil and gas industry. *See, e.g.*, *Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 565-67 (5th Cir. 2000); *Henry v. Ballard & Cordell Corp.*, 418 So. 2d 1334, 1339-40 (La. 1982).[12]

---

[12] In *Henry*, the Louisiana Supreme Court explained: "In ascertaining [the contracting parties'] intention (where it cannot be adequately discerned from the contract or agreement as a whole) the circumstances surrounding the parties at the time of contracting are a relevant subject of inquiry." *Henry*, 418 So. 2d at 1339-40 (citing *Cooley v. Meridian Lumber Co.*, 197 So. 255, 258 (La. 1940)); *see Frey*, 603 So. 2d at 173 ("[In *Henry*,] we reasoned the ambiguity in the royalty provision could not be resolved without consideration of the practical and

No. 11-30038

Applying the foregoing principles, we conclude that the "calculate and pay" clauses do not clearly and explicitly show that the parties to the assignment contracts intended that the lessees' obligation to pay overriding royalties out of production would ever be suspended under any circumstances. There is no reference whatsoever to "royalty suspension" or "overriding royalty suspension" in the assignment contracts. The "calculate and pay" clauses clearly and explicitly provide only that overriding royalties "shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease." Those clauses do not clearly and explicitly state that payment of overriding royalties shall be suspended during the temporary or threshold suspension of the payment of the government's landowner royalty under the DWRRA. Consequently, under Civil Code article 2046 and the Louisiana cases, a court may not find that the parties intended to suspend the overriding royalty obligation based exclusively on the words of the calculate and pay clauses but must interpret the overriding royalty contracts further in search of the parties' common intent. *See CLK*, 972 So. 2d at 1286 ("A contract is considered ambiguous . . . when it lacks a provision bearing on [a particular] issue or when the language used in the contract is uncertain or is

---

economic realities of the oil and gas industry at the time the leases were negotiated . . . ."); *Cooley*, 197 So. at 258 ("[W]e must give consideration to the surrounding circumstances existing at the time the contract was made[.]"). "In interpreting a contract 'it should be construed in the light of the circumstances surrounding [the parties] at the time it is made, it being the duty of the court to place itself as nearly as may be in the same situation of the parties at the time, so as to view the circumstances as they viewed them, and so to judge the meaning of the words and the correct application of the language of the contract." *Henry*, 418 So. 2d at 1339 n.12 (alteration in original) (quoting *C. A. Andrews Coal Co. v. Bd. of Dirs. of Pub. Schools, Parish of Orleans*, 92 So. 303, 304 (La. 1922)). "The custom of the industry may also be considered in determining the true intent of the parties as to ambiguous contract provisions." *Id.* at 1340 (citing, inter alia, *Fee v. Vancouver Plywood Co., Inc.*, 331 So. 2d 151, 155 (La. Ct. App. 1976)); *cf. Wadkins v. Wilson Oil Corp.*, 6 So. 2d 720, 724-25 (La. 1942) (affirming cancellation of mineral lease for lessee's failure to develop leased premises according to recognized custom and progressive practices among operators in the field).

16

No. 11-30038

fairly susceptible to more than one interpretation." (quoting *Blanchard*, 755 So. 2d at 381)).

Our conclusion is further supported by the well-recognized distinction between overriding royalty interests and a lessor's royalty. Unlike the government's royalty reserved under OCSLA, "[a]n overriding royalty [interest] is a fractional interest in the gross production of oil and gas under a lease, *in addition to the usual royalties paid to the lessor*." *Meeker v. Ambassador Oil Co.*, 308 F.2d 875, 882 (10th Cir. 1962) (emphasis added), *rev'd on other grounds*, 375 U.S. 160 (1963). Thus, an overriding royalty interest "is an interest carved out of the lessee's share of the oil and gas, ordinarily called the working interest, *as distinguished from the owner's reserved royalty interest*." *Id.* (emphasis added); *see also Frey*, 603 So. 2d at 171 n.8 (explaining that "[t]he lessor's royalty is distinguished from the . . . overriding royalty" interest, which "is carved out of the lessee's working interest in the lease"). Particularly in light of this longstanding distinction drawn between overriding royalty interests and the royalties reserved by the landowner, we disagree with the district court's reasoning that the contracting parties were obligated to expressly state that royalty suspension would *not* apply to appellants' overriding royalty interests. *See Total*, 2010 WL 5207591, at *5. Rather, the absence of any clear indication anywhere in the assignment contracts, lease, or relevant statutory scheme that statutory suspension of government royalties was also, counterintuitively, intended to apply to the overriding royalty interests renders the contracts at least ambiguous on this issue.

Moreover, the syntax of the ORRI assignments and lease provisions, without further interpretation or evidence, do not clearly or explicitly require the reading of them argued for by Total and Statoil. The ORRI assignment contracts state that the overriding royalty percentages shall be "payable out of *all* oil, gas, and casing head gas and associated substances produced, saved, and marketed

17

from the lease" (emphasis added); and it is undisputed that the lessees' share of production begins with and is payable throughout production from the lease. This reasonably can be read to signify that the overriding royalty shall be payable from the lessees' share of production over its entirety, and not only during periods in which the landowner is entitled to a royalty share of production. Likewise, the simple affirmative declaration that the overriding royalty shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty is calculated and paid under the lease does not indicate that the overriding royalties paid out of the lessees' share of production shall ever be suspended during that production. To require a suspension of overriding royalties payable from the lessees' production before the lessees actually cease to receive production from the lease would add an exception or condition to the grants of overriding royalties upon which the lessees and override owners in those contracts did not clearly or explicitly agree.

Furthermore, Total and Statoil tacitly concede that they cannot completely and finally rely on what they contend to be the clear and explicit words of the "calculate and pay" clauses. They ultimately contend that reading these clauses of the assignment contracts together with a footnote in the underlying lease shows that the assignment parties intended to suspend the override obligation during any suspension of the United States' right to collect landowner's royalty. This alternative argument's reading together of three different contracts, one to which none of the ORRI owners was a party, however, does not produce clear and explicit words showing an intent by the original lessees and the ORRI owners to suspend the lessees' obligation to pay them overriding royalties out of the lessees' share of production. It simply adds an indefinite, unclear, and ambiguous footnote from the lease to the interpretative problem facing the courts in this case.

No. 11-30038

The footnote that Total and Statoil seek to rely upon in the underlying lease between the United States, as lessor, and Mariner Energy and Westport, as lessees, states: "This lease may be eligible for royalty suspension pursuant to PL 104-58. If eligible, Sections 5 and 6 of the lease instrument will be superseded by 30 CFR, Part 26, published to the Federal Register on January 16, 1998 (63 FR 2626)." The footnote does not clearly and explicitly express an intention by the lessor and lessees that the lease "*shall* be eligible" for royalty relief under the DWRRA. Therefore, royalty suspension was not clearly and explicitly made a term or condition of the lease that was binding on the lease parties or third parties. For these reasons, and also because the Belcher Group and Kerr-McGee were not parties to the lease, the footnote expresses no clear and explicit agreement or intent by the overriding royalty owners to forfeit or defer any of their rights to overriding royalties payable by the lessees out of any future production under the lease.[13] Furthermore, as we have discussed earlier in this opinion, in 1999 and 2001 when the ORRI assignments were made,

---

[13] The dissent's reliance on *Petrohawk Properties, L.P. v. Chesapeake Louisiana, L.P.*, 689 F.3d 380 (5th Cir. 2012), for the proposition that overriding royalty suspension was incorporated by reference is unpersuasive, in part because that case is clearly distinguishable. In *Petrohawk*, the parties to a new mineral lease explicitly incorporated by reference all but specifically designated provisions from an earlier lease. We held that the parties thereby adopted an express exclusion of warranty of title clause from the old lease because it was not designated for change or deletion in the new lease. Essentially, the same parties expressly re-adopted the exclusion of warranty of title clause that they had agreed to in their previous lease contract. *See id.* at 394. Here, the parties to the ORRI assignments are not the same as the parties to the mineral lease, and they did not expressly incorporate the subjunctive footnote in the mineral lease. *JS&H Const. Co. v. Richmond Cnty. Hosp. Auth.*, 473 F.2d 212 (5th Cir. 1973), is inapposite as well. There, a construction sub-contractor entered an agreement with the prime contractor expressly incorporating by reference the "General Conditions" of the prime contract which included a provision that the parties would submit contract disputes to arbitration. We held that the sub-contractor was bound by the arbitration provision because a strong policy favors arbitration and the subcontractor's express agreement to incorporate the "General Conditions" of the prime contract is generally effective when the provisions so adopted have a reasonably clear and ascertainable meaning. *Id.* at 214-16. Here, the situation is different. This case does not involve arbitration of public contract disputes and the ORRI assignment contract parties did not expressly agree to incorporate any lease term dictating suspension of overriding royalties.

whether production from a particular eligible lease would receive landowner's royalty suspension under the DWRRA, regardless of the fluctuating prices of oil and gas or of whether the well was the first in its field, was not reasonably foreseeable until the decisions of this court in *Santa Fe Snyder Corp. v. Norton*, 385 F.3d 884 (5th Cir. 2004), and *Kerr-McGee Oil & Gas Corp. v. U.S. Dep't of Interior*, 554 F.3d 1082 (5th Cir. 2009). "In interpreting a contract 'it should be construed in the light of the circumstances surrounding [the parties] at the time it is made, it being the duty of the court to place itself as nearly as may be in the same situation of the parties at the time, so as to view the circumstances as they viewed them, and so to judge the meaning of the words and the correct application of the language of the contract." *Henry*, 418 So. 2d at 1339 n.12 (alteration in original).  Even if we were to presume that the parties to the assignment contracts could foresee that the lessees would be entitled to landowner royalty relief under the DWRRA, they still did not subscribe to any words that clearly and explicitly state any intent to suspend, forfeit, or defer *overriding* royalty rights.  Consequently, reading the "calculate and pay" clauses of the ORRI assignment contracts together with the underlying lease's footnote does not clearly and explicitly show that the assignment contract parties intended to suspend the lessees' obligation to pay overriding royalties to the ORRI owners whenever the government's 12½% landowner's royalty is suspended under the DWRRA or that the lessees' obligations to pay overriding royalties out of production to the override owners would be suspended under any circumstances.[14]

---

[14] Moreover, as discussed above, under the implementing regulations in force on the dates the lease was issued and the assignment contracts were entered, "when production occur[red] from an eligible lease, the Interior [Department would] determine[] from what field the lease [was] producing and what royalty suspension volume (if any) applie[d] to the lease," and "[n]ew [l]eases only received the benefit of royalty suspension if the lease was determined to be in a field that had not produced prior to the enactment of the [DWRRA]." *Santa Fe Snyder Corp.*, 385 F.3d at 889-90.  Thus, at the time the form lease was issued, royalty

No. 11-30038

Accordingly, we disagree with the district court, which reached the opposite result based on the following reasoning:

> [I]t is undisputed that the DWRRA applies to the subject Lease, and thus, the federal government's royalty is suspended during production of the first 87.5 million barrels of oil equivalent. Now, having examined the four corners of the subject Assignments and interpreting each provision "in light of the other provisions so that each is given the meaning suggested by the contract as a whole" (La. Civil Code Art. 2050), the court finds that the subject "Calculate and Pay" clauses are not ambiguous because they clearly provide that the overriding royalties "shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's [federal government's] royalty under the Lease." Thus, Total's and Statoil's payments of the overriding royalty interest payments are suspended until production reaches the 87.5 million barrels of oil equivalent.

*Total*, 2010 WL 5207591, at *4 (second alteration in original).

Of course, the district court is correct that it is now undisputed that the DRWWA landowner's royalty relief applies to the subject lease. But as we have pointed out, that was not so when the subject lease was issued in 1998 or when the ORRI assignment contracts were entered in 1999 and 2001. Prior to the litigation that culminated in our decisions in *Santa Fe Snyder Corp.* in 2004 and *Kerr-McGee* in 2009, it was at most speculative whether the lessees under the subject lease would receive the benefit of DRWWA landowner's royalty relief if and when production were obtained. That is likely why the footnote in the lease

---

suspension was one possible outcome of an administrative process, provided for not by the lease but by statute and regulation, and which in turn depended on whether the lease was deemed "eligible" and whether the relevant field had produced prior to the effective date of the DWRRA. *See id.* The lease nowhere indicates whether the field in which it is located is one that had produced prior to that date. Thus, it cannot be said that the footnote constitutes a clear and explicit term or condition of the lease requiring a suspension of landowner's royalty.

21

is indefinite and says only that the lessees "may" be eligible for landowner royalty relief.[15]

Furthermore, simply because a lessee is entitled to DRWWA relief from paying the government landowner royalties until a specified quantity of production has occurred does not relieve the lessee from the obligation of measuring, calculating, and accounting for its production of oil and gas from the leased property. OCSLA and applicable DOI regulations continue to specify how that production is measured, calculated, and accounted for. *See, e.g.*, 43 U.S.C. § 1337(a)(C) (limiting government royalty relief to specific production volumes); 30 C.F.R. §§ 250.1201-03 (setting forth and incorporating by reference requirements for measuring oil and gas production from OCSLA leases); 30 C.F.R. §§ 1206.100-60 ("explain[ing] how [OCS] lessee[s] must calculate the value of production for royalty purposes consistent with the mineral leasing laws, other applicable laws, and lease terms"); *cf. Abraham v. BP Am. Prod. Co.*, 685 F.3d 1196, 11991203 (10th Cir. 2012) (noting that there are "specific and comprehensive federal regulations" setting forth "federal royalty calculation requirements").[16] The lease here was, of course, expressly "issued subject to

---

[15] The dissent contends that there is no "lack of clarity regarding whether the royalty suspension period was a term of the lease that the overriding royalties became subject to through the 'calculate and pay' clauses." As already explained, however, the only reference to the DWRRA in the lease is the indefinite and ambiguous statement that the lease "may" be eligible for suspension of government royalties under the DWRRA. Moreover, neither the DWRRA nor its implementing regulations have ever purported to suspend or affect lessees' obligations to pay overriding royalties to ORRI owners out of production. In arguing that this "footnote negates the lessee's duty to make royalty payments," such that "royalty suspension is a term or condition of the landowner's royalty under the lease," the dissent conflates overriding royalty with landowner royalty and refuses to acknowledge the crucial legal distinctions in source and nature of the two kinds of royalty. *See, e.g.*, *Frey*, 603 So. 2d at 171 n.8.

[16] All of this tends to bolster the ORRI owners' argument that the "calculate and pay" clauses reasonably can be construed to refer to the federal methods of measuring, calculating and paying overriding royalties, rather than to any suspension of overriding royalties, and that the "calculate and pay" clauses are therefore ambiguous and require further interpretation.

[OCSLA] . . . and all . . . applicable statutes and regulations," including specifically "all regulations issued pursuant to [OCLSA] . . . which provide for . . . the protection of correlative rights." Without clearly stated methods of measurement, calculation, and accounting, the federal government as landowner would not have certain knowledge of how much production had occurred or when its rights to collect landowner's royalty would recommence. Consequently, the "calculate and pay" clauses may reasonably be interpreted as intended to entitle the ORRI owners to their share of the lessees' production under these same methods of measurement, calculation, and accounting without relieving the lessees of their obligation to pay overriding royalties to the ORRI owners out of the entirety of the lessees' working interest production.

In other words, the "calculate and pay" clauses reasonably may be interpreted to mean that the overriding royalty payments shall be calculated and paid by using the same methods prescribed for the measurement and computation of the landowner's royalty under the terms and conditions of the lease, which is specifically subject to the federal regulations' provisions for measuring, calculating, and accounting for production, instead of meaning that the payment of overriding royalties shall be suspended if the landowner's royalty were to be suspended under the DWRRA. Although we have assumed that Total and Statoil's contrary interpretation is equally as reasonable for purposes of their summary judgment motion, we conclude that the clauses are ambiguous and require further interpretation in search of the parties' intent.

The district court, on the other hand, did not specifically address the ORRI owners' reasonable interpretation of the clauses, despite the ORRI owners' extensive arguments for it in their opposition to summary judgment. Consequently, the district court erroneously concluded that the clauses are not ambiguous but that they clearly and explicitly are meant to suspend overriding royalties during any suspension of the landowner's royalty, as well as, or,

instead of, to prescribe the methods for their calculation. The district court stated that it had examined the assignment contracts, and each of their provisions together with the others, and had found "that the subject 'Calculate and Pay' clauses are not ambiguous because they clearly provide that the overriding royalties 'shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's [federal government's] royalty under the Lease.'" *Total*, 2010 WL 5207591, at \*4 (alteration in original). We do not find the district court's reasoning persuasive because the words of the "calculate and pay" clauses are not clear, explicit, and unambiguous, and the district court did not offer any other reason for finding these provisions unambiguous.

Because the ORRI owners, the Belcher Group and Kerr-McGee, did not file a cross motion for summary judgment or ask for any relief here other than a reversal of the district court's judgment, we do not reach the parties' other arguments or consider the affidavits submitted in opposition to summary judgment below. Under Louisiana law, interpretation of a contract is the determination of the common intent of the parties, La. Civ. Code art. 2045, and when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent, *id.* art. 2046. However, the inverse of Article 2046 is also true: when the words of the contract are not clear and explicit, but are ambiguous, a court should engage in further interpretation in search of the parties' intent by applying the Louisiana Civil Code articles on contractual interpretation and pertinent Louisiana cases. *See, e.g.*, *Henry*, 418 So. 2d at 1339-40 ("In ascertaining th[e] [contracting parties'] intention (where it cannot be adequately discerned from the contract or agreement as a whole) the circumstances surrounding the parties at the time of contracting are a relevant subject of inquiry. . . . The custom of the industry may also be considered in determining

24

the true intent of the parties as to ambiguous contract provisions."); *Russell v. City of New Orleans, Dep't of Prop. Mgmt.*, 732 So. 2d 66, 70 (La. Ct. App. 1999) ("The words of the contract are not clear and explicit . . . , so further interpretation may be made in search of the common intent."). That is the situation here. Therefore, we reverse the district court's grant of summary judgment and remand the case to it for further proceedings in which it should consider relevant evidence in interpreting the disputed provisions in accordance with applicable principles of Louisiana law on the interpretation of contracts.

### CONCLUSION

For these reasons, the district court's judgment is reversed and the case is remanded to it for further proceedings consistent with this opinion.

No. 11-30038

HIGGINSON, Circuit Judge, concurring:

I agree with Judge Dennis' reasoning and outcome, but write to explain in further detail why I believe the contracts' language is ambiguous.

The overriding royalty interest ("ORRI") assignment contracts contain "calculate and pay" clauses stating: "The overriding royalty interest assigned herein shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease." Like many complex sentences, ambiguity exists in this one's structure. ORRI is the subject, and one predicate is the "calculate[ ] and pay" verb phrase.

Appellants imply that the prepositional phrase and subordinate clause that follow—*i.e.*, "in the same manner and subject to the same terms and conditions"—modify that verb phrase, *cf. Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 79-80 (1991), and because the verb phrase "calculate[ ] and pay" is affirmative, it logically does not imply its opposite, nonpayment or suspension. Manners and terms and conditions all contemplate payment in the first place. In simpler terms, this reading would be less ambiguous if written as follows: "The ORRI shall be calculated and paid in the same manner as the landowner's royalty under the Lease," persuasively, therefore, not contemplating suspension altogether, but just regulating payment.

Contrastingly, Appellees' argument points to meaning from a different grammatical arrangement, where ORRI itself is modified by the final clause "subject to the same terms and conditions as the landowner's royalty," hence, plausibly, subject even to nonpayment or suspension altogether. In simpler, less ambiguous terms: "The ORRI shall be subject to the same terms and conditions as the landowner's royalty under the Lease," even if that condition is suspension altogether. Indeed, had the sentence separated that dependent clause by

26

commas—thus: ", and subject to the same terms and conditions,"—Appellees would have a stronger argument as to clarity of meaning.

Given the language of the contracts, however, I cannot say that, for the reasons above, the sentence is free of ambiguity.

No. 11-30038

EMILIO M. GARZA, Circuit Judge, dissenting:

**I**

Because royalty suspension is a term or condition of royalty payment under the lease and the "calculate and pay" clauses of the assignment contracts make the overriding royalty interests subject to the same terms and conditions as the landowner's royalty under the lease, I respectfully dissent from the majority's conclusion that the assignment contracts are ambiguous.

Royalty suspension is unambiguously a term or condition of the landowner's royalty under the lease. The first footnote of the lease states, "This lease may be eligible for royalty suspension pursuant to PL 104-58." PL 104-58 refers to Public Law No. 104-58, which includes the Outer Continental Shelf Deep Water Royalty Relief Act (hereinafter "DWRRA"). According to the DWRRA, "suspension of royalties shall be set at a volume of not less than . . . 87.5 million barrels of oil equivalent for leases in water depths greater than 800 meters." Pub. L. No. 104-58. It is undisputed that because this lease covered a block of property located in water depths greater than 800 meters, the landowner's royalty is suspended on the first 87.5 million barrels of oil produced under the lease. The footnote next states, "If eligible, Sections 5 and 6 [providing for payment of royalty to Lessor] of this lease instrument will be suspended by 30 C.F.R. Part 26 . . . ." 30 CFR Part 260[1] refers to Outer Continental Shelf Oil and Leasing, 43 U.S.C. § 1331 et seq, where the provisions of the DWRRA are codified. The footnote thus clearly requires that if the lease is eligible for royalty suspension under the DWRRA, Sections 5 and 6 of the lease will be suspended. As Sections 5 and 6 of the lease provide instructions for calculating and paying the landowner's royalty under the lease, the footnote unambiguously makes

---

[1] Because 30 CFR Part 260 refers to Outer Continental Shelf Oil and Leasing, 43 U.S.C. § 1331 et seq, and 30 CFR Part 26 does not exist, the footnote likely intended to refer to 30 CFR Part 260.

28

royalty suspension a term or condition of payment of the landowner's royalty under the lease.

The majority, however, finds it ambiguous whether the footnote is a term or condition of the lease because the footnote states the lease "may be eligible" rather than "shall be eligible." The majority might be correct if the footnote did not also state, "If eligible, Sections 5 and 6 of this lease instrument will be *superseded* by 30 CFR Part 26. . . ." (emphasis added). Black's Law Dictionary defines a "term" as a "contractual stipulation," BLACK'S LAW DICTIONARY 1608 (9th ed. 2009), and a "condition" as "a future and uncertain event on which the existence or extent of an obligation or liability depends; an uncertain act or event that triggers or negates a duty to render a promised performance." *Id.* at 333. The footnote clearly stipulates that the lease's provisions for payment of royalties are superseded by the DWRRA if the lease is eligible for royalty suspension, thus qualifying the lessee's contractual duty to make royalty payments to the United States. Where the lease is eligible for royalty suspension, the footnote negates the lessee's duty to make royalty payments. As such, royalty suspension is a term or condition of the landowner's royalty under the lease.

The "calculate and pay" clauses in the assignment contracts unambiguously make the overriding royalty interests subject to the same terms and conditions as the landowner's royalty under the lease. The "calculate and pay" clauses of the Westport Assignment to the Belcher Group state, "The overriding royalty interest assigned herein shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease." The "calculate and pay" clause in the Westport to Chevron Assignment contains nearly identical language. The majority holds "the 'calculate and pay' clauses in the ORRI assignment contracts do not clearly and explicitly express the intent that overriding royalty payments shall be

29

suspended whenever the U.S. landowner royalties are suspended under the DWRRA." *Ante*, at 4. The majority thus finds it ambiguous whether the assignment contracts apply royalty suspension to overriding royalty interests. The plain language of the "calculate and pay" clauses state, however, that payment of the overriding royalties must be *subject to* the same terms and conditions as the landowner's royalty under the lease. The Oxford English dictionary defines "subject to" as "dependent or conditional upon." OXFORD ENGLISH DICTIONARY 1427 (10th ed. 1999); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2275 (1993) (defining "subject to" as "to be conditioned, affected, or modified in some indicated way: having a contingent relation to something and usually dependent on such relation for final form, validity, or significance"). Thus, the "calculate and pay" clauses clearly and explicitly import terms and conditions from the lease as limitations on the scope of the overriding royalty rights.

The majority, emphasizing the longstanding distinction between overriding royalty interests and royalties reserved by the landowner, holds it is ambiguous whether the "calculate and pay" clauses require application of royalty suspension to the overriding royalty interests. *Ante* at 18–19. The majority holds the assignment contracts lack "any clear indication" that royalty suspension was intended to apply to the overriding royalty interests. *Id.* The majority is correct that overriding royalty interests are generally paid in addition to the usual landowner's royalty reserved to the lessor. 38 AM. JUR. 2D *GAS AND OIL* § 201. As such, the parties to overriding royalty interest assignment contracts are free to set terms for the calculation and payment of such interests that are distinct from the terms of payment of the landowner's royalty. *See id.* Here, however, the assignment contracts contain a clear directive that the overriding royalty interests "shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's

No. 11-30038

royalty under the Lease." If the parties did not intend the clear import of the contracts' language, they may seek to reform the contract. *Agurs v. Holt*, 95 So. 2d 644, 645 (1957). Where, however, the language of a contract is clear and unambiguous, we lack the authority to look beyond the four corners of the document in search of the parties' intent. LA. CIV. CODE ANN. art. 2046; *Taita Chem. Co., v. Westlake Styrene Corp.*, 246 F.3d 377, 386 (5th Cir. 2001).

The majority relies on the fact that it was not certain the lease would qualify for suspension of the United States' landowner royalty under the DWRRA at the time the lease at issue in this case was signed as a core source of ambiguity in the "calculate and pay" clauses. The majority correctly notes that prior to our decisions in *Santa Fe Snyder Corp. v. Norton*, 385 F.3d 884 (5th Cir. 2004), and *Kerr-McGee Oil & Gas Corp. v. U.S. Dep't of Interior*, 554 F.3d 1082 (5th Cir. 2009), there was some uncertainty surrounding whether a particular lease would qualify for royalty suspension.[2] Nonetheless, this uncertainty does not translate into ambiguity as to whether the assignment contracts require the overriding royalty payments to be subject to the same terms and conditions as the landowner's royalty under the lease. The majority assumes that because it was debatable whether royalty suspension would apply, the parties to the assignment contracts did not intend royalty suspension to be one of the terms and conditions of payment that the overriding royalties are subject to. *Ante*, at 21.

This assumption is unwarranted. The parties to the assignment contract may have intended exactly what the plain language of the "calculate and pay"

---

[2] *See Santa Fe Snyder Corp.*, 385 F.3d at 892–93 (holding Department of Interior regulation restricting the DWRRA's royalty suspension provisions to fields that had not produced prior to enactment of Act was invalid); *Kerr-McGee Oil & Gas Corp.*, 554 F.3d at 1083 (holding Department of Interior regulation requiring payment of royalties on volumes less than volume thresholds set by the DWRRA when gas prices reached certain levels was invalid).

31

clauses state: to make the calculation and payment of the overriding royalties subject to the same terms and conditions as the landowner's royalty under the lease. A lack of clarity surrounding when the royalty suspension period would apply does not evince a lack of clarity regarding whether the royalty suspension period was a term of the lease that the overriding royalties became subject to through the "calculate and pay" clauses.

The majority also concludes the "granting" clauses of the assignment contracts make the meaning of the "calculate and pay" clauses ambiguous. The granting clause in the Westport Assignment to the Belcher Group states, "The undersigned . . . does hereby CONVEY, TRANSFER, ASSIGN, AND SET OVER unto the following parties . . . the interest set out opposite their names, as an overriding royalty interest payable out of *all* oil, gas, casinghead gas and associated substances produced, saved and marketed from the lease." (emphasis added). The granting clause in the Westport to Chevron Assignment states, "The interest assigned herein is subject to . . . an overriding royalty interest totaling one percent (1%) of *8/8ths* . . . of oil and gas production saved, removed, or sold from the Lease." (emphasis added). The majority implies that if the parties intended to require the overriding royalty owners to wait until the lease produced 87.5 million barrels of oil before receiving royalty payments, the phrasing of the granting clauses would not have explicitly granted the overriding royalty owners an interest in *all* or *8/8ths* of production. This is unconvincing. Even within the four corners of the assignment contract to the Belcher group, the "granting" clause was clearly never meant to be unqualified. In the ORRI assignment to the Belcher group, exceptions to royalty due on production are listed explicitly in the assignment contract. For example, the assignment contract states,

> The overriding royalty interest conveyed shall not, in any event, be paid or accrued upon any oil, gas, casinghead gas and other hydrocarbon substances used for operation, development or

32

No. 11-30038

> production purposes or unavoidably lost; and no overriding royalty
> shall be paid upon gas used in repressuring or recycling operations
> or pressure maintenance operations.

Moreover, the clear language of the "calculate and pay" clauses in both of the assignment contracts qualify the granting clauses by stating that the overriding royalty interests are to be calculated and paid "*subject to* the same terms and conditions as the landowner's royalty under the lease." (emphasis added).

The majority also finds the assignment contracts ambiguous because there is no reference to royalty suspension in the assignment contracts. The lack of the explicit reference to royalty suspension in the assignment contracts proves nothing. The "calculate and pay" clauses incorporate the terms and conditions of the landowner's royalty under the *lease.* Even under the proposed interpretation of the "calculate and pay" clauses that the majority urges, the terms and conditions the "calculate and pay" clauses allegedly refer to, the so-called "mechanics" of payment, are not explicitly stated in the assignment contracts. The fact that the assignment contracts do not both incorporate the royalty suspension provision by reference to the terms and conditions of the landowner's royalty under the lease *and* mention the royalty suspension provision by name does not an ambiguity make. Where a term is incorporated by reference to an extrinsic agreement, the contract need not also mention the incorporated term within the four corners of the contract. *See Petrohawk Props., L.P. v. Chesapeake La., L.P.*, 689 F.3d 380, 394 (5th Cir. 2012) (holding provisions incorporated by reference have identical force and effect to provisions within the contract itself).[3]

---

[3] The majority's attempt to distinguish *Petrohawk Properties* is unavailing. *Ante* at 20 n.13. In that case we held the parties adopted a provision of an earlier lease that was incorporated by reference in the new lease. *Petrohawk Props.*, 689 F.3d at 394. Importantly, the new lease did *not* explicitly mention the provision at issue, an exclusion of the warranty of title. *Id.* Rather, the new lease merely incorporated all provisions other than those explicitly designated. *Id.* The majority attempts to distinguish *Petrohawk Properties* on two grounds. First, the majority notes that in *Petrohawk Properties* the parties to the new lease

No. 11-30038

The majority also finds support for concluding the "calculate and pay" clauses are ambiguous in the fact that the overriding royalty interest owners were not a party to the lease. This is puzzling. It is well-established that when a contract incorporates terms of an extrinsic agreement by reference, the parties to the contract may not rely on the fact that they are not parties to the extrinsic agreement as a source of ambiguity. *See JS & H Constr. Co. v. Richmond Cnty. Hosp. Auth.*, 473 F.2d 212, 216 (5th Cir. 1973) (holding subcontractor bound by arbitration provision incorporated by reference from the general conditions of contract between primary contractor and principal).[4] Despite the majority's

were the same parties as the parties to the old lease. This is a distinction without a difference. Nowhere in *Petrohawk Properties* did we state or imply the fact the parties to the new lease and the old lease were identical was relevant to our holding that the exclusion of the warranty of title was incorporated by reference. *Id.* Moreover, the majority cites no authority for the proposition that incorporation by reference is more effective where the parties to both contracts are identical. Second, the majority states that, unlike here, the parties in *Petrohawk Properties* "expressly re-adopted the exclusion of warranty of title clause." *Ante* at 20 n13. This assertion is false. In *Petrohawk Properties* the new lease stated, "In conjunction with this correction of the description of the leased premises, of the primary term and with the additional provisions, Lessor ratifies, adopts, and confirms the Lease, as corrected. . . ." Record Excerpt of Appellant Petrohawk Properties, L.P. at 80, Petrohawk Props., (No. 11-30576). Nowhere did the new lease mention the exclusion of warranty of title provision of the old lease. *Id.* at 79–81. Moreover, the exclusion of the warranty of title "provision" in the old lease was hardly a model of clarity. The district court held the old lease had no implied warranty of title provision because it contained "a scratched through warranty of title provision." Chesapeake La., L.P. v. Petrohawk Props., L.P., 5:09-cv-01385-DEW-MLH, No. 09-1385, Ruling on Merits at 6 (E.D. La. May 27, 2011). Therefore, *Petrohawk Properties* supports the proposition I rely on it for: the fact the assignment contracts here did not mention royalty suspension by name is not a convincing reason for finding it ambiguous whether the contracts incorporated the royalty suspension provision of the lease.

[4] The majority emphasizes that in *JS & H Constr. Co.* the provision at issue was an agreement to arbitrate disputes arising under the contract. *Ante* at 21 n.13. We thus based our holding that the sub-contractor was bound to arbitrate both on (1) the strong Congressional policy favoring arbitration and (2) "[t]he . . . undisputed proposition . . . that as a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where, as here, the provision to which reference is made has a reasonably clear and ascertainable meaning." *JS & H Const. Co.*, 473 F.2d 212 at 215. In *JS & H Const. Co.* we correctly recognized that under Louisiana law where a contract incorporates terms of an extrinsic agreement by reference, the fact the identity of the parties to the contract differ from the parties to the extrinsic agreement does not render the incorporation ineffective. *See*

34

assertions to the contrary, the assignment contracts make a clear and unambiguous statement that payments of the overriding royalties will be limited by the terms and conditions of the landowner's royalty under the lease.

Finally, Judge Higginson's concurring opinion contends the grammatical structure of the "calculate and pay" clauses support a finding of ambiguity. Although I agree with Judge Higginson that grammatically the clauses are susceptible to two different interpretations, under either reading the "calculate and pay" clauses unambiguously require application of royalty suspension to the overriding royalty interests. Admittedly, the prepositional phrase and subordinated clause "in the same manner and subject to the same terms and conditions" may modify the "calculate and pay" verb phrase, as Appellants imply, or may modify the subject of the sentence, "The overriding royalty interest," as Total and Statoil urge. Judge Higginson thus asserts it is ambiguous whether the "calculate and pay" clauses answer the question of whether the overriding royalty owners are entitled to a royalty payment, or merely provide instructions for the how to calculate and pay the royalty payments that are due under the assignment contract. Regardless of whether the lease is eligible for royalty suspension and the payment due is zero or the lease is ineligible for royalty suspension and a monetary payment is due, however, royalty suspension is inextricably linked to the calculation of the amount of payment due to the landowner under the lease. Thus, even if "terms and conditions" modifies "calculated and paid," "terms and conditions" modifies entitlement to the royalties vel non.

---

*also Harper v. Home Indem. Co.*, 140 So. 2d 653, 657 (La. Ct. App. 1962) ("[W]e conclude that all the provisions of the initial contract have been incorporated into and form a part and portion of the subcontract just as effectively as if fully written and incorporated therein.").

No. 11-30038

## II

Appellants also claim that in the event we reject their interpretation of the "calculate and pay" clauses as unreasonable, the original parties to the assignment contracts made a mutual mistake in drafting the "calculate and pay" clauses. The district court cited two reasons for denying Appellants' claim for reformation. First, the district court held Appellants were attempting "to make an end-run around the parole-evidence rule by framing [their] argument as a request for reformation." The district court held that because the assignment contracts were unambiguous, parole evidence is not admissible to create ambiguity. Second, the district court held that because Total and Statoil, as non-parties to the original contracts, were *entitled* to rely on the integrity of the assignment contracts, reformation would impermissibly prejudice Total and Statoil. The district court misconstrued Louisiana's reformation law on both points.

The district court erred by failing to admit Appellants' extrinsic evidence of mutual mistake. When making a claim for reformation the claimant may offer parole evidence, not to vary the terms of the written instrument, but to show the "writing does not express the true intent or agreement of the parties." *First State Bank & Trust Co. of E. Baton Rouge Parish v. Seven Gables, Inc.*, 501 So. 2d 280, 289 (La. Ct. App. 1986) (citing *Valhi, Inc. v. Zapata Corp.*, 365 So. 2d 867, 870 (La. Ct. App. 1978)). "Even if the language utilized is clear and unambiguous, parol evidence is admissible to establish that the language does not embody the essence of the agreement to which there was mutual assent." *Valhi, Inc.*, 365 So. 2d at 870. The district court thus erred by refusing to admit extrinsic evidence of mutual mistake simply because the contract is unambiguous.

The district court also erred by denying Appellants' reformation claim on the grounds that Total and Statoil, as third parties, were *entitled* to rely on the

integrity of the assignment contracts.  Under Louisiana law, reformation of a contract is impermissible once third parties *have relied* on the integrity of the written instrument.  *Lewis*, 653 So. 2d at 1260.  Where, however, the rights of third parties would not be prejudiced by reformation, reformation is permissible. *See Samuels v. State Farm Mut. Auto. Ins. Co.*, 939 So. 2d 1235, 1241 (La. 2006); *M.R. Bldg. Corp. v. Bayou Utils., Inc.*, 637 So. 2d 614, 617 (La. Ct. App. 1994) (permitting reformation where rights of third party successor in chain of title would not be prejudiced by reformation).  While Louisiana law is clear that third parties are *entitled* to rely on the integrity of the contracts, third parties must have actually relied on the erroneous contract language to be prejudiced. *See Samuels*, 939 So. 2d at 1241 ("There are simply no rules of contractual interpretation that would lead us to ignore the clear intent of the parties to the fortuitous benefit of a third party insurance company who did not even rely on this error in issuing its own policy."); *cf. Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 288 (5th Cir. 2009) (denying claim for reformation where third party assumed and relied on contract and there was no indication third party would have known of error).  The district court thus erred in denying Appellants' claim for reformation on the basis that Total and Statoil were *entitled* to rely on the unambiguous contract language.

## III

Accordingly, I would affirm the district court's holding that the assignment contracts unambiguously apply the royalty suspension provision of the DWRRA to the overriding royalty interest owners.  I would reverse the district court's grant of summary judgment on Appellants' claim for reformation, but only on the grounds specifically stated by the district court.

Respectfully, I dissent.