# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 28, 2020

Lyle W. Cayce
Clerk

No. 17-60817

SHAQUERE MYLESHIA GRAY, Co-Administratrix of the Estate of Gregory Tramaine Miller; HANNAH LASHA HOZE, Co-Administratrix of the Estate of Gregory Tramaine Miller,

      Plaintiffs - Appellants

v.

ALABAMA GREAT SOUTHERN RAILROAD COMPANY,

      Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before OWEN, Chief Judge, and DENNIS and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Gregory Tramaine Miller was crushed to death between the couplers of two rail cars while working as a conductor trainee with Alabama Great Southern Railroad Company. Summary judgment dismissing all claims was granted on the basis that there was no evidence to support imposing any liability on the railroad. The administrators of Miller's estate argue on appeal that there was evidence to create a jury issue. We AFFIRM.

No. 17-60817

## FACTUAL AND PROCEDURAL BACKGROUND

On August 12, 2015, Gregory Miller was assigned to an Alabama Great Southern train crew consisting of a conductor, M.A. Sillimon; a brakeman, J.D. Henderson; and an engineer, A.C. Clearman. Miller rode the train to a facility in Petal, Mississippi, in order to couple empty rail cars that would then be taken to a different facility. Miller rode on one side of the train to the Petal facility. Upon arrival, he safely crossed over the tracks on foot to the other side of the train, using a safety procedure called "3-Step Protection" for crossing between standing rail cars.

The Alabama Great Southern is a wholly owned subsidiary of the Norfolk Southern Railway Company. Each company uses the same Operating Rules and Safety & General Conduct Rules. Operating Rule 22 prohibits an employee from going between standing equipment on the tracks for any reason unless 3-Step Protection is first established. Going between moving equipment on the tracks is never permitted. To establish 3-Step Protection, an employee must first orally request passage between cars from the engineer. If the request is made via radio, the employee must provide his or her occupation, job symbol, and engine number. Once such a request is made, the second step is for the engineer to take the following action: "apply the independent brake"; next, "[p]lace the reverser lever in neutral position"; and finally, "[o]pen the generator field switch." Third, before the employee is permitted to go between equipment on the tracks, the engineer "must acknowledge to each requesting employee that '3-Step Protection' is established."

After Miller successfully established 3-Step Protection and crossed the tracks to the other side of the train, the train crew began to couple 11 rail cars. At the start, each rail car was approximately ten feet from the next one. The crew's train coupled the first uncoupled car waiting on the switch track, and the train was brought to a safety stop to ensure that coupling was successful.

2

No. 17-60817

After the first coupling, Henderson was positioned at the north end of the line of cars and Sillimon was at the south end. Miller was about one-half of a car length south of Henderson, who was supervising Miller that night. Henderson, while facing north toward the train coupled to the engine and away from Miller, radioed the crew, "Everybody let me get big half to a bunch," meaning that the engineer should begin a "rolling coupling" of the remaining ten rail cars by slowly shoving the train south at a speed never exceeding two miles per hour, impacting and coupling each car, one right after the other, without stopping.

As the train approached, Henderson walked backward while facing north toward the train to give "full attention on the engine coming down," then started to turn south to observe the couplings. At this time, for reasons unknown and without 3-Step Protection, Miller went between two rail cars during the rolling coupling. Henderson testified that as he was turning to the south, he noticed a "flash" and told Clearman to cease coupling by radioing, "That will do." Henderson could not see Miller, so he began walking south and found Miller fatally injured, caught in the coupling between two rail cars, the second of three couplings made during the shove.

As co-administrators of Miller's estate, Shaquere Myleshia Gray and Hannah Lasha Hoze filed suit against the Alabama Great Southern Railroad Company. They claimed the railroad was negligent in failing to train, instruct, and supervise Miller, that the railroad also was negligent in failing to provide a safe place to work for Miller, and that it was foreseeable that Miller would go between rail cars, which was the cause of his death.

In granting summary judgment for the railroad, the district court concluded that Miller's failure to establish 3-Step Protection before going between rail cars was the sole cause of his death, that his going between moving rail cars was unforeseeable, and that the plaintiffs failed to produce

No. 17-60817

evidence of any negligent acts by the railroad attributable to causing Miller's death.  This timely appeal followed.

DISCUSSION

The suit was brought under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51.  The FELA provides the exclusive remedy for a railroad employee engaged in interstate commerce whose injury resulted from the negligence of the railroad.  *Rivera v. Union Pac. R.R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004).  The FELA allows an injured railroad employee to recover damages for "injury or death resulting in whole or in part from the negligence" of the railroad.  § 51.  "Under FELA the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  *CSX Transp., Inc., v. McBride*, 564 U.S. 685, 692 (2011).  This standard leaves in place, though, the plaintiff's burden to provide evidence of "all the same elements as are found in a common law negligence action."  *Armstrong v. Kansas City S. Ry. Co.*, 752 F.2d 1110, 1113 (5th Cir. 1985).  Indeed, "foreseeability is an essential ingredient of negligence under the Act."  *Id.*

The FELA eliminated a variety of traditional defenses, such as the fellow-servant rule, the assumption-of-the-risk defense, and the doctrine of contributory negligence.  *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542–43 (1994); 45 U.S.C. §§ 51, 53–55.  Even so, if a plaintiff's negligence is the sole cause of the injury, a defendant has no liability under the Act.  *Southern Ry. Co. v. Youngblood*, 286 U.S. 313, 317 (1932).

We review a grant of summary judgment *de novo*, meaning this court considers the evidence dond law in the same manner as the district court was required to do.  *Ibarra v. UPS*, 695 F.3d 354, 355 (5th Cir. 2012).  Summary

No. 17-60817

judgment is appropriate if the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under the FELA, awarding summary judgment to the defendant railroad is appropriate "[o]nly when there is a complete absence of probative facts" to support a jury verdict in the plaintiff's favor. *See Lavender v. Kurn*, 327 U.S. 645, 653 (1946). "This standard is highly favorable to the plaintiff and recognizes that the FELA is protective of the plaintiff's right to a jury trial." *Wooden v. Mo. Pac. R.R. Co.*, 862 F.2d 560, 561 (5th Cir. 1989) (punctuation edited).

The plaintiffs argue that Miller's failure to establish 3-Step Protection was not the sole cause of his death because the railroad's negligence must also have had a role in the accident. They contend that there was "overwhelming evidence" of at least some negligence by the railroad. Among their arguments is that Henderson negligently supervised Miller. There was evidence that the railroad used a supervisor/trainee system for on-the-job training. On the night of the accident, Henderson was Miller's supervisor. Although Henderson was working as a brakeman that night, he was a certified conductor, making it appropriate for him to supervise a conductor trainee. The plaintiffs say that Henderson was negligent because "a mentor should know where his mentee is at all times as he is in charge of ensuring the mentee's safety." At the time of the incident, though, "Henderson had his back to Mr. Miller, did not know where he was, and did not know what Mr. Miller was doing at any point while the shoving movement was occurring." The plaintiffs also argue that Henderson violated the railroad's procedure by failing "to observe the coupling that was occurring when Mr. Miller was injured."

There is no record evidence of any policy requiring that a supervisor never stop looking at a conductor-trainee. Plaintiffs say such evidence does exist, as Sillimon in his deposition testified that a trainee should always be

5

"within eyesight" of the supervisor.  We do not interpret that testimony as supporting that the supervisor cannot as necessary look a different direction than the trainee during performance of the job.  Instead, the supervisor must always be in a position to "keep an eye" on the trainee, meaning no obstruction to the view, even though at times the supervisor must concentrate on other tasks.  The plaintiffs agree that Henderson was required to observe the couplings, which means he would have had to take his eyes off Miller during the first coupling, apparently just before Miller went between the second set of rail cars.

The only evidence as to rules for coupling is testimony vaguely describing a conductor and brakeman's duty of "observing a coupling."  We know from the record that Henderson was in the process of turning to observe a coupling when he saw a "flash," which was Miller's going between the rail cars.  Henderson radioed Clearman to stop the train.  Having considered plaintiffs' contentions to the contrary, we conclude there was no evidence that Henderson violated any procedure that played a part in Miller's death.

The plaintiffs also contend that the railroad negligently trained Miller because he "was never trained on the procedures of a rolling couple and the only evidence in the record suggests that he had never heard of such a move."  The plaintiffs also argue the failure of Miller's crew members to "adequately job brief this procedure . . . played a central role in bringing about this injury."  Thus, according to the plaintiffs, "[t]here is no evidence in the record to show that Mr. Miller had any reason to believe that the cars would continue to move or that he would be in danger if he needed to get between cars."

The plaintiffs' point is that if Miller had not been made aware of rolling couplings, then his undisputed knowledge of the procedures to be followed prior to going between cars would, at the time of his fatal violation of those procedures, have been joined by his ignorance that the cars would keep moving

No. 17-60817

after the initial coupling. Certainly, it was negligent for Miller to have gone between the cars, but a failure of others to explain what was occurring could have left him unaware of just how dangerous his actions would be. The only evidence of a source for Miller's knowledge was not identified by the railroad until oral argument in this court. We may, but are not required, to consider this evidence despite its late identification because we may affirm a judgment on any ground that appears in the record. *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 537 (5th Cir. 2003). We discuss the evidence.

The evidence comes from Sillimon's deposition. The dissent does not see that testimony in quite the same way we do, viewing it as a possibly generic description of how the work should be done as opposed to what was done that night. We will summarize the immediately preceding testimony, then quote at some length the relevant statements. Sillimon was asked about the coupling that had been completed by this same crew at other locations earlier on the night of Miller's death. He mentioned the first location but did not explicitly describe any rolling coupling there. The railroad's counsel then asked Sillimon to describe what happened at the second location, which still was not the job site where Miller was fatally injured that same day:

> Q: All right. And how many cars did y'all work that night [at the second location]? Do you know?
>
> A: It was 20 -- it was 20 in, 20 out.
>
> Q. Okay. And y'all have to spot all 20 of them?
>
> A. That's correct.
>
> Q. And how do y'all go about spotting these cars? How do y'all handle that?
>
> A. You spot each car up one at a time.
>
> Q. Okay. And take me through what you would do as the conductor, what the brakeman would do, and what the engineer would do in spotting these cars.

7

No. 17-60817

A. As far as the brakeman and the conductor, it can go either or.

Q. Okay.

A. I can walk down and do a C-100 [which he would later describe as checking each car prior to starting the coupling] and check everything, make sure the hoses are -- make sure there's no one in the tracks, make sure the hoses are down, make sure any chocks or anything that we couple up to -- so it won't derail anything. Or the brakeman can walk down and do a C-100. And after we do a C-100, I'll be in position at the bottom. The brakeman be in position at the top. He will make the first coupling, and the rest of the couplings be run-in coupling.

Q. And you refer to that as a running couple?

A. That's correct.

Q. And what -- what is a running couple?

A. When you couple up to the -- you got to make sure you coupled up to the first car. Once you coupled up to the first car, you bunch to the next car. Then you bunch and then you bunch until you get to the last two cars. You stop the move. You couple up to that second to the last car, and then you couple up to the next car.

In summary, Sillimon started by saying it was necessary to "spot all 20" cars at the earlier location. He then was asked how the crew would accomplish that spotting. Certainly, some of his lengthy answer could be taken as a general description of how the tasks are done, particularly in stating that either the brakeman or the conductor could perform certain of the functions. The key to us, though, is that Sillimon testified that a series of rolling couplings had to be made at the job site preceding the one where Miller was fatally injured. Perhaps there were shortcomings in initial training or otherwise in making Miller aware of the dangers of a rolling coupling, specifically that the train keeps moving as the closely spaced but not yet coupled cars are sequentially linked. Regardless of that possibility, Sillimon testified that Miller had just experienced that sort of coupling.

The plaintiffs also argue that it is a fact dispute whether Miller requested 3-Step Protection. They discuss evidence that requesting over the radio is not always heard. There is a protection for that built into the three steps, though, *i.e.,* the requesting employee must wait for the engineer to "acknowledge to each requesting employee that '3-Step Protection' is established." It is undisputed that Sillimon did not acknowledge 3-Step Protection to any employee during the time Miller went between the rail cars and suffered his fatal injuries.

Last, the plaintiffs contend that "[i]t is wholly foreseeable that an employee will get between cars during the course of his work, especially when as here he is expecting the movement to stop for some period of time." They rely on a Supreme Court decision in which the decedent stepped between standing rail cars to detach a damaged car. *Chicago Great W. R.R. v. Schendel*, 267 U.S. 287, 289 (1925). There, the rail cars sat on a downward grade and gravity caused the rail car to slide into the decedent, fatally injuring him. *Id.* The Court held that although the decedent was partially negligent, the railroad was liable because there was evidence that the damaged rail car did not meet the statutory requirements to protect him, and that damage was the reason he had stepped between the cars. *Id.* at 292. Unlike in *Schendel*, though, Miller was killed during continuous coupling of cars, a process he had just witnessed elsewhere, and during a time in which he knew not to cross between cars without following the described protocols. In some circumstances it of course is foreseeable that railroad employees will get between cars. In the circumstances here, stepping between cars was prohibited and the reasons for the prohibition would have been clear.

Finally, we consider whether plaintiffs are correct that the district court improperly relied at least in part on a finding that Miller assumed the risk of injury by stepping between the cars. As we stated, the FELA abolished

assumption of the risk and similar defenses. *See Gottshall*, 512 U.S. at 542–43. According to the plaintiffs, the district court's reliance on the fact that Miller knew how to utilize 3-Step Protection based on training and experience means that it concluded that Miller assumed the risk of ignoring that protocol.

We see no application of this discarded defense by the district court. Though the district court mentioned that Miller was trained and tested on the safety procedure before he went to field training, the court was merely explaining Miller's negligence. The district court stated that the plaintiffs "ha[d] not produced evidence of any negligent acts attributable to [the railroad] that caused the accident." *Gray*, 2017 WL 6805046, at *3. That is a reference to a lack of evidence, not to an assumption of risk.

"If the employee's negligence was the sole proximate cause of his injury, he cannot recover." *Atlantic Coast Line R. Co. v. Dixon*, 189 F.2d 525, 527 (5th Cir. 1951). Though there is a lack of clarity as to exactly what happened, Miller, unfortunately, negligently went between the two cars. In the absence of any evidence to support a jury finding that some negligence on the part of the railroad contributed to the accident, summary judgment was proper.

AFFIRMED.

No. 17-60817

JAMES L. DENNIS, Circuit Judge, dissenting.

I respectfully dissent. In my view, the record contains evidence from which a reasonable jury could find that Miller's death resulted at least in part from AGS's negligence: Miller was a new hire of about forty-five days with no prior railroad experience, and he had not been schooled, trained, or instructed in the multi-car rolling coupling procedure that resulted in his death. Miller, therefore, may not have understood that more than a single car would be coupled, and Henderson, the brakeman responsible for Miller's supervision, failed to keep Miller close to him and within his eyesight during the rolling coupling. A reasonable jury could thus infer that the railroad's negligence played a part, *even the slightest*, in producing the injury or death for which damages are sought, such that this case should proceed to a jury trial.

## I.

FELA prescribes that:

Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death *resulting in whole or in part* from the negligence of any of the officers, agents, or employees of such carrier . . . .

45 U.S.C. § 51 (emphasis added). Congress enacted FELA in response to the dangers inherent in working on the railroad, and its language on causation "is as broad as could be framed." *Urie v. Thompson*, 337 U.S. 163, 181 (1949); *see Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542-43 (1994). The Supreme Court has recognized that "in comparison to tort litigation at common law, 'a relaxed standard of causation applies under FELA.'" *CSX Transportation, Inc., v. McBride*, 564 U.S. 685, 692 (2011) (quoting *Gottshall*, 512 U.S. at 542-43). "Under FELA the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury or death for which damages are

11

sought." *Id.* (emphasis added) (quoting *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957)).

We review a district court's grant of summary judgment for the railroad de novo, and "we must resolve all ambiguities, permissible inferences, and material issues of fact in favor of the non-moving parties." *Total E & P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 429 (5th Cir. 2013).  In a FELA case, it is the province of the jury to weigh many factors, including the nature of the task and the hazards it entails, in determining whether employer fault "played any part, even the slightest," in the employee's injury.  *McBride*, 564 U.S. at 692; *see Bailey v. Central Vt. Ry.*, 319 U.S. 350, 353-54 (1943).

The majority concludes that Plaintiffs have not produced evidence of any negligent acts attributable to AGS that caused the accident and that Miller's negligence in going between the moving rail cars was not foreseeable.  I disagree.  Plaintiffs point to several acts or omissions by AGS and its employees that a reasonable jury could find were negligent and "played [a] part, even the slightest, in producing" Miller's death.  *McBride*, 564 U.S. at 692.

First, the record reveals that Miller had been employed in railroad work only forty-five days at the time of his death, and though he attended a classroom training center in Georgia for nineteen days, the center did not instruct conductor trainees like Miller on rolling couplings, the procedure the crew employed at the time Miller was killed.  The written rules and guidance provided to Miller as a conductor trainee also did not describe the rolling coupling procedure.  In the classroom, trainees were taught a different procedure for coupling a single railcar—the engineer slowly drives the train until it makes the connection with the car being coupled, the engineer stops the train, and the crew members go between the cars to finalize the coupling. Crew members then walk to the next rail car on the track to prepare for the next coupling.  In practice, however, AGS employees also used a "rolling

coupling" procedure to couple more than a single rail car at a time, the procedure that the crew utilized at the time Miller was killed. When executing a rolling coupling, the engineer stops once after the first standing car is coupled to the train, then, when signaled, he shoves the train at walking speed, impacting and coupling each remaining uncoupled car, one right after the other, without stopping until the next to last standing uncoupled car is coupled. Once the second to last rail car is coupled, the train stops briefly, then the engineer drives the train into the last car until it is coupled. Then the crew makes sure that all couplings are secure, connects the air hoses between the cars, and cuts the air in to the now-coupled cars.

Though the trainees were taught the rules prohibiting employees from going between moving railcars and that they must request 3-Step Protection before moving between standing cars on a track,[1] they were not specifically trained or given any written or oral instruction on how the rules applied to rolling couplings of a "bunch" of cars or the additional dangers inherent in the rolling coupling of as many as nine to ten cars without stopping between individual couplings. A reasonable jury could conclude that the railroad was negligent in failing to provide Miller with basic training in rolling couplings before he was required to participate in such a dangerous procedure in his work.

Second, a reasonable jury could find that, as in his classroom training, Miller was not instructed during his on-the-job training as to how to participate in a rolling coupling, nor was he provided notice that the crew was going to perform a rolling coupling prior to the crew activating that dangerous

---

[1] Another rule explains that employees must not cross tracks "between standing separated cars or locomotives unless the equipment is separated by at least 50 feet and the employee maintains at least l0 feet of separation between themselves and the nearest equipment." Three-step protection is required where, as here, "a locomotive is coupled to standing equipment or is on the same track in a position to couple to the equipment."

procedure in which he was killed.  For the on-the-job stage of their training, conductor trainees like Miller were assigned to a variety of jobs for a little over three months, with different crews and conductors in charge of each job. During the job briefing on the night of the accident, Sillimon, the senior conductor and leader of the crew, did not provide Miller with any information or instruction about rolling couplings or tell him that the crew would use a rolling coupling at any location, and no one mentioned Miller's lack of experience or instructed him as to what he was expected to do or was responsible for during a rolling coupling.  As noted in AGS's expert's report, at the worksite where Miller was killed, the crew first used a single car coupling to connect the first uncoupled standing car on the track to the rest of the train—once the first car was connected, the train stopped.  A jury could infer that Miller, because of his inexperience and lack of schooling, instruction and training, would have expected the next coupling to be a single-car coupling as well, after which the train would stop moving.  However, Henderson called for a rolling coupling, saying, "Everybody let me get a big half to a bunch," a phrase that would inform only knowledgeable workers—those familiar with a rolling coupling and the terminology used to call for one—that Henderson was calling for a rolling coupling of as many as ten cars.  It is undisputed that this jargon was not taught in the rulebook or classroom training and is instead something that employees must pick up on from their work in the field.  From the facts in the record, a jury could find that Miller, who had been out of the classroom for less than a month, did not know what Henderson's instruction meant, and therefore had no reason to understand that the train would not stop after another coupling, but would continue rolling, impacting and coupling cars up to the point where he was killed.  A jury could conclude these failures by the railroad and by Miller's supervisors were also negligent.

No. 17-60817

Moreover, Plaintiffs have consistently contended that Miller did not know what a rolling coupling was, had not been informed that the maneuver would be used at the work site, and was only familiar with the standard single-car coupling procedure.  AGS did not dispute any of these facts in the district court or in its brief to this court.  At oral argument before this court, however, counsel for AGS cited to Sillimon's deposition and contended that it showed Miller had been exposed to a rolling coupling earlier on the night that he was killed.

I disagree with the defense counsel's oral argument and the majority's contention that Sillimon's deposition testimony provides conclusive evidence that Miller had previously witnesses a rolling coupling earlier on the night he was killed.  Maj. Op. at 7-9.  At the start of the relevant portion of the deposition, Sillimon was answering questions about a job the crew worked the night of the accident.  He was then asked: "And how do y'all go about spotting these cars?  How do y'all handle that?"  After an explanation of what the brakeman and conductors typically do, Sillimon concluded: "He will make the first coupling, and the rest of the couplings be run-in coupling."  Sillimon then explained in general the process of a running or rolling coupling.

The pretrial deposition does not specify that Sillimon, in speaking of rolling couplings, was describing the process employed by the crew at a different facility earlier on the night of the accident instead of simply describing the process of a rolling coupling generally.  Given the ambiguity of the testimony and our obligation to resolve such ambiguity in Miller's favor, I would conclude that there is at least a genuine issue of material fact as to whether Miller had seen a rolling coupling earlier in the evening on the night of the accident.  *See Total E & P USA Inc.*, 719 F.3d at 429 ("[I]n reviewing the summary judgment de novo, we must resolve all ambiguities, permissible

inferences, and material issues of fact in favor of the non-moving parties . . . .").

Finally, Plaintiffs have presented evidence in opposition to AGS's motion for summary judgment that AGS employees failed to reasonably mentor or supervise Miller. Though Sillimon was the senior conductor and Henderson had only eight months of experience as a conductor, Sillimon put Henderson in charge of mentoring and supervising Miller at the time of the accident. Henderson had been cited five times for rules violations in 2015 and 2016. On the night of the accident, when Henderson instructed the engineer to start the rolling coupling, Henderson had his back turned toward Miller who was half a car length away from Henderson. Henderson then walked backward, still facing away from Miller, as the engineer proceeded to couple up three railroad cars, all with Miller being out of Henderson's eyesight. As Henderson turned to face the south, he noticed a "flash" in his *peripheral* vision, providing further evidence that Miller was out of Henderson's sight and close supervision. Together, these facts would support a reasonable jury in finding that Henderson, for whose acts and omissions AGS is vicariously responsible, was an inattentive and careless supervisor whose failure to mentor and supervise Miller contributed to the accident that caused his death.

The majority claims that "[t]here is no record evidence of any policy for which a conductor-trainee must always be within view of their supervisor." However, Darren Gooch, a trainmaster who worked for AGS, testified that the "rule" when supervising conductor trainees was to keep them "within sight distance and close," and Sillimon acknowledged in his deposition that when he was a conductor-trainee, the brakeman or conductor kept him "within eyesight." This is an issue for the jury, who could reasonably conclude that AGS was responsible for Henderson's failure to mentor, closely supervise, and watch Miller during the dangerous rolling coupling procedure.

No. 17-60817

## II.

Though Miller may have been negligent in assuming only a single car was to be coupled and in moving between the railcars without requesting 3-Step Protection, it is well-established in FELA law that the railroad can still be liable if its negligence contributed in part to the danger even when the employee's negligence was the more direct cause of the injury. *McBride*, 564 U.S. at 695 (rejecting the argument that "the railroad's part . . . was too indirect" a cause when compared to the employee's negligence). When executing a single car coupling that Miller was taught in the classroom, the engineer would stop after each coupling, and employees would go between each of the newly coupled cars to turn on the air and check the connection for the cars. A reasonable jury could conclude, then, that due to his lack of supervision, training, and experience, Miller went between the cars because he did not understand that the crew was executing a rolling coupling and that the impacts and movements of the rail cars would not stop after a single car had been coupled.

Though no case presents identical facts, the Supreme Court has required the submission of FELA cases to juries based on even slighter proof of negligence and causation. *See Lavender v. Kurn*, 327 U.S. 645, 648-49, 652 (1946) (circumstantial evidence that worker killed by skull fracture was struck on head by mail hook swinging from side of railway company's mail car was sufficient for jury); *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 109-10, 122 (1963) (upholding a jury verdict for a plaintiff who lost both his legs as a result of an infected insect bite because railroad was negligent in maintaining a stagnant pool of water attractive to vermin and insects).

**\* \* \***

The Supreme Court has instructed that "the test of a jury case [under FELA] is simply whether the proofs justify with reason the conclusion that

17

employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers*, 352 U.S. at 506. "The burden of the employee is met . . . when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference." *Id.* at 508. It is irrelevant that "the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." *Id.* at 506.

Submission of a FELA case to the jury is required "in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Id.* at 510. This case is clearly not one of those rare cases in which every reasonable juror must conclude that the employer's negligence played no part—not even the slightest—in the employee's injury and death. *See id.*; *McBride*, 564 U.S. at 692. The majority opinion, in failing to account for the special features of FELA's negligence action that make it significantly different from the ordinary common-law negligence action, contributes to the steady erosion and undermining of the right to a jury trial under FELA in this Circuit. *See also Huffman v. Union Pac. R.R.*, 675 F.3d 412, 426, 433 (5th Cir. 2012) (Dennis, J., dissenting) ("The evidence in this case is manifestly sufficient to meet the test of a jury case under the FELA, which is simply whether employer negligence played any part, even the slightest, in producing the injury."). For the foregoing reasons, I dissent.